574 A.2d 1130

**Pamela S. ZUMMO, Appellee,**

v.

**David M. ZUMMO, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 31, 1989.

Filed May 17, 1990.

32

34

Edwin E. Thompson, Ambler, for appellant.

David L. Ladov, Norristown, for appellee.

Before ROWLEY,* KELLY and JOHNSON, JJ.

KELLY, Judge:

In this case we are asked to determine whether an order prohibiting a father from taking his children to religious services "contrary to the Jewish faith" during periods of lawful custody or visitation violated the father's constitutional rights, or constituted an abuse of discretion. We find that, under the facts of the instant case, the father's constitutional rights were violated, the trial court's discretion was abused, and the restriction challenged cannot be sustained. We vacate the restriction imposed.

We are also called upon to determine whether the father may be directed to present the children at Synagogue for Sunday School during his periods of weekend visitation. We affirm this part of the trial court's order.

* Judge Rowley replaced Judge Melinson on this panel following oral argument as the result of the expiration of Judge Melinson's commission.

## I. Historical Backdrop

Custody and visitation cases essentially involve salvaging operations. Judges are asked to preserve, as best as may be, the interests of any children involved, while at the same time disentangling their parent's spousal relationship. Under the best of circumstances it is a task requiring Solomonic judgment.

The difficulties involved are compounded when emotional issues such as the religious upbringing of children are involved. Venerable advocate for religious liberty, Leo Pfeffer, explained in 1935:

> Few areas of litigation are more difficult for dispassionate and disinterested judicial determination and more likely to evoke strong and passionate reactions by the protagonists, to cause the general public to take sides, and to incite acrimonious debate among religious groups than the area of litigation involving religious consideration in the upbringing of children.

Pfeffer, *Religion in the Upbringing of Children*, 35 BULR 333, 333 (1935).[1] In light of the sensitive ground we tread, we set forth our analysis in detail. Before entering into an examination of the specific issues raised in this appeal concerning the role of the courts in mediating or resolving parental disputes regarding the post-divorce religious upbringing of children, we think it important to discuss generally the broader issues of religious freedom and parental authority which impact on the specific issues raised here.

---

1. More recently, Professor Egon Mayer, a noted sociologist who has conducted landmark research on religious intermarriage, has similarly observed:

 > When sober discussion would be most in order, the subject frequently generates more heat than light. The ambivalence that many feel about their own commitments to human brotherhood, to the primacy of the love relationship, and to individualism, on the one hand, and the strong desire to pass on certain traditions of one's ethnic and religious group, on the other, often leads to intense friction between parents and their adult children, among couples who are contemplating (or are already in) an intermarriage, and throughout the wider ethnic and religious community.

 Mayer, *Love and Tradition: Marriage Between Jews and Christians*, at 10 (1985).

## A. *Religious Freedom*

America was founded in an era of extreme religious bigotry and persecution. In 1856, Pennsylvania Justice Jeremiah S. Black explained:

All the colonies were founded during the seventeenth century, and that was precisely the time when persecution was committing its most frightful ravages in Europe. The savage cruelty with which the contest of opinion was carried on by all parties, the judicial murders and the wholesale slaughters ..., are the saddest pages in the history of the human race. Bigotry rode rampant and red over all lands.

\* \* \* \* \* \*

Burning, beheading, and hanging, as well as imprisonment, branding, and maiming, were in universal fashion. Men of the most fervent piety, the highest talents, and the most blameless lives, suffered inflictions so cruel and so ignominious, that, even at this distance of time, they cannot be thought of without unspeakable indignation. It was from these scenes of terror, conflagration, blood, and tears, that the earliest settlers of America fled. Most of them had suffered more or less for their faith, and all of them ought to have known that justice and sound policy were both in favor of free conscience. But this proposition, plain as it seems to us, was then very generally repudiated. The intellect, indeed, comprehends it readily enough, but in all ages the heart of man has learned it slowly and reluctantly.

Black, "Religious Liberty" (an address delivered September 17, 1856), *printed in* C. Black, *Essays and Speeches of Jeremiah S. Black*, at 55–56 (1886).

The steps taken by our founding fathers to renounce religious oppression and to protect religious freedom were bold and momentous. Even so, religious freedom did not spring forth at our founding like Minerva in full armor.

At that time, the vast majority of colonists were associated with various Protestant sects, with a small but influ-

ential Catholic population, and only about 2,500 Jews dispersed throughout the colonies.[2] When religion was considered in the Constitutional Convention and later in the first Congress, the focus was on Christian pluralism, rather than universal religious freedom. Concerning the First Amendment, Justice Joseph Story explained:

> The real object of the amendment was not to countenance, much less to advance, Mohametenism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment which should give to an hierarchy the exclusive patronage of the national government....

III *Story's Commentaries on the Constitution*, 664 (3rd.Ed.1858). Notwithstanding our founders' Christian sectarian focus, the broader implications of the ban on religious tests and the Free Exercise and Establishment Clauses for universal religious freedom were plainly understood. In response to criticism of the ban on religious tests as an unwarranted invitation for Jews, Muslims and Atheists to enter politics, James Iredell (later Justice of the United States Supreme Court) responded in the North Carolina ratification convention by asking rhetorically, how was "it possible to exclude any set of men, without taking away that principle of religious freedom which we ourselves so warmly contend for?" IV *Elliot's Debates* 194 (2d.Ed.1937).[3]

The ideal of religious freedom planted in our national conscience by our founding fathers grew from seed to tree despite the storms of prejudice which rose and fell as waves

---

**2.** *See* Stark & Finke, *American Religion in 1776: A Statistical Portrait,* 49 Sociological Analysis 39, 39–51 (1988); Dawidowicz, *On Equal Terms: Jews in America,* at 167 (1984) (Appendix A); Herberg, *Protestant–Catholic–Jew,* at 18 (1955).

**3.** *See also* Adams & Emmerich, *A Heritage of Religious Liberty,* 137 U.Pa.L.Rev. 1559, 1559–1643 (1989) (detailing the founder's diverse views regarding the scope of religious freedom protected); Carey, *American Catholics and the First Amendment: 1776–1840,* 113 Pa.Mag. Hist. & Bio. 323, 323–46 (1989) (same, Catholic founders); Pfeffer, *Jews, Jewry and the American Constitution,* Jewish Digest 3, 3–12 (June 1983) (same, focusing on Jewish concerns).

of ethnically, culturally, and religiously diverse immigrants came to our shores and were integrated into our increasingly pluralistic American society. As with so many basic rights affirmed by our founders, the struggle to extend the promise of the Free Exercise Clause and the protection of the Establishment Clause beyond Christian sects to all Americans (including adherents of non–Christian faiths, agnostics, and atheists) has been, at times, difficult and controversial.[4] Nonetheless, Americans today enjoy religious freedom as broad and as deep as mankind has ever known.

In a recent decision on this subject, the United States Supreme Court explained:

This Nation is heir to a history and tradition of religious diversity that dates from the settlement of the North American continent. Sectarian differences among various Christian denominations were central to the origins of our Republic. Since then, adherents of religious too numerous to name have made the United States their home, as have those whose beliefs expressly exclude religion.

Precisely because of the religious diversity that is our national heritage, the Founders added to the Constitution a Bill of Rights, the very first words of which declare: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." Perhaps in the early days of the Republic these words were understood to protect only the diversity within Christianity, but today they are recognized as guaranteeing religious liberty and equality to "the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism." *Wallace v. Jaffree,* 472 U.S. 38, 52 [105 S.Ct. 2479, 2487, 86 L.Ed.2d 29] (1985). It is settled law that no government official in this Nation may violate

4. *See generally* Miller, *Religious Liberty in America: History and Prospects, passim* (1976); Herberg, *The Integration of the Jew Into America's Three Religion Society,* 5 Church & State 27, 27–40 (1963); Herberg, *Protestant–Catholic Jew, supra* at n. 2, *passim;* Pfeffer, *Church, State, & Freedom,* at 577–97 & *passim* (1953).

these fundamental constitutional rights regarding matters of conscience. *Id.*, at 49 [105 S.Ct., at 2485].

*County of Allegheny v. ACLU*, 492 U.S. ——, ——, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472, 491–92 (1989) (per Blackmun, J.; joined in this part by Brennan, Marshall, Stevens, and O'Connor, JJ.). The Supreme Court also noted that its prior decisions had established that, "no person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance," and that, "the Establishment Clause at the very least, prohibits government from ... 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.*, 492 U.S. at ——, 109 S.Ct. at 3101, 106 L.Ed.2d at 493–95 (collecting cases).

Our Supreme Court had repeatedly expressed the same sentiments regarding religious freedom:

Pennsylvania, more than any other sovereignty in history, traces its origins directly to the principle that the fundamental right of conscience is inviolate. *See The Papers of William Penn*, Vol. I (Dunn & Dunn, University of Pennsylvania Press), pp. 51–52, 90–93, 268, 280, 452, 511. In general, thus, our Commonwealth is neutral regarding religion. It neither encourages nor discourages religious belief. It neither favors nor disfavors religious activity. A citizen of this Commonwealth is free, of longstanding right, to practice a religion or not, as he sees fit, and whether he practices a religion is strictly and exclusively a private matter, not a matter for inquiry by the state.

*JIRB v. Fink*, 516 Pa. 208, 231, 532 A.2d 358, 369 (1987), *quoting Commonwealth v. Eubanks*, 511 Pa. 201, 206, 512 A.2d 619, 622 (1986).

 It has long been a fixed star in our constitutional constellation that no government official, high or petty, have any authority whatsoever to declare orthodoxy in matters of religion. *See West Virginia v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, 1639 (1943). Moreover, as courts may not divine truth or falsity in matters of religious doctrine, custom, or belief, courts

may not give weight or consideration to such factors in resolving legal disputes in civil courts. *See Employment Division v. Smith,* —— U.S. ——, ——, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876, 889 (1990); *Jones v. Wolf,* 443 U.S. 595, 602–05, 99 S.Ct. 3020, 3025–26, 61 L.Ed.2d 775, 784–85 (1979); *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–15, 96 S.Ct 2372, 2380–83, 49 L.Ed.2d 151, 162–66 (1976); *Presbyterian Church v. Hull Church,* 393 U.S. 440, 445–52, 89 S.Ct. 601, 604–07, 21 L.Ed.2d 658, 663–67 (1969); *Watson v. Jones,* 13 Wall 679, 728–29, 20 L.Ed. 666, 676–77 (1872); *see also* Note, *The Establishment Clause and Religion in Child Custody Disputes,* 82 Mich.L.Rev. 1702, 1716 n. 49 (1984) (collecting other United States Supreme Court cases).

The sword of justice which had been bloodied in aid of religious oppression in Europe was sheathed by the First Amendment, the Fourteenth Amendment, and state constitutional equivalents. To unsheathe that sword and wield it in *any* religious conflict is a serious matter. Such action may only be taken in support of countervailing interests of the highest order, and then only in the least intrusive manner adequate to safeguard the specific interests identified. *See Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15, 25 (1972); *see also Employment Division v. Smith, supra,* —— U.S. at ——, 110 S.Ct. at 1601, 108 L.Ed.2d at 885; *Jimmy Swaggart Ministries v. Board of Equalization,* 493 U.S. ——, ——, 110 S.Ct. 688, 693, 107 L.Ed.2d 796, 806 (1990).

### B. *Parental Authority*

Though allusions to King Solomon's famous custody case [5] abound in modern custody cases, a material difference exists which renders the modern cases far more difficult than the one which taxed King Solomon's great wisdom. King Solomon was faced with the difficult task of determining the child's *true* mother from the *false* claimant. Modern courts, on the other hand, are faced with a more

---

5. I Kings 3: 23–27.

agonizing choice between two claimants whose assertions of parentage are both unquestionably true.

Historically, courts have resolved such conflicting claims to post-divorce parental authority with rules and rigid presumptions rather than searching or individualized analysis. Until the early nineteenth century the ancient doctrine of *patria potestas* gave fathers virtually unlimited right to custody and control of all legitimate off-spring until they reached the legal age of majority. In the early nineteenth century, courts began to reject *patria potestas* in favor of a *pariens patria* power of the government to award custody in accordance with the judicially determined "best interests" of the children. In practice, however, rejection of the paternal preference embodied in the *patria potestas* doctrine merely paved the way for a maternal preference *via* the tender years presumption which dominated the "best interests" analysis.[6]

The time in which such gender preferences could be rationalized or justified, however, has since past into unlamented history along with the repressive gender stereotypes which drove the preferences. Women now pursue careers and provide for their children; men now nurture and care for their children. Parenthood has grown more complicated, and the grand over-simplifications which governed child custody in the past have become positively anachronistic.[7]

**6.** *See generally,* Ahl, *A Step Backward,* 70 Minn.L.Rev. 1344, 1347–48 (1986); Brosky & Alford, *Sharpening Solomon's Sword,* 81 Dickinson L.Rev. 683, 683–85 (1977); Radcliff, *Pennsylvania Child Custody: The Tender Years Doctrine—Reason or Excuse,* 81 Dickinson L.Rev. 775, 775–92 (1977); Derdeyn, *Child Custody Contests in Historical Perspective,* 133 Am.J.Psych. 1369, 1369–76 (1976); Mnookin, *Child Custody Adjudication: Judicial Functions in the Face of Indeterminacy,* 39 L. & Cont.Prob. 226, 232–37 (1975); *Shelford on Marriage and Divorce,* at 410 (1841).

**7.** *See generally* Everett, *Shared Parenthood in Divorce: The Parental Covenant and Custody Law,* 2 J.Law & Religion 85, 92–93 & n. 15 (1985) (discussing the decline of the maternal preference; collecting authorities). *But see* Uviller, *Father's Rights and Feminism: The Maternal Preference Revisited,* 1 Harv.J. Womens Rights 107, 107–30 (1978) (advocating the retention of a gender nuetral primary parent preference).

■ Under current Pennslyvania law, a special need for the association of one parent rather than the other may no longer be assumed on the basis of a stereotype driven presumption; rather, the child's interests in such association must be proven by competent evidence. *See Commonwealth ex rel Spriggs v. Carson,* 470 Pa. 290, 368 A.2d 635 (1977); *Michael T.L. v. Marilyn J.L.,* 363 Pa.Super. 42, 525 A.2d 414, 416 (1987); *Schall v. Schall,* 251 Pa.Super. 262, 380 A.2d 478 (1977).

The rejection of gender preferences is in harmony with the developing constitutional jurisprudence in this area. The United States Supreme Court has expressly recognized that, "[a] father, no less than a mother, has a constitutionally protected right to the companionship, care, custody and management of the children he has sired and raised, which undeniably warrants deference and, absent a powerful countervailing interest, protection." *Weinberger v. Wiesenfeld,* 420 U.S. 636, 652, 95 S.Ct. 1225, 1235, 43 L.Ed.2d 514, 527 (1975). The Supreme Court has also specifically rejected the notion that gender based classifications in custody matters could be justified "by any universal difference between maternal and paternal relations at every phase of a child's development." *Caban v. Mohammed,* 441 U.S. 380, 389, 99 S.Ct. 1760, 1766, 60 L.Ed.2d 297, 305 (1979) (rejecting a maternal preference justification when the children in question were *four* and *six* years-old).

The demise of gender stereotypes, and a wide and growing body of research indicating the importance of *both* parents to healthy child development [8] have caused courts to

**8.** *See generally* Allison & Furstenberg, *How Marital Dissolution Affects Children,* 25 Developmental Psychology 540, 540–49 (1989); Fishel, *Children's Adjustment in Divorced Families,* 19 Youth & Society 173, 173–96 (1987); McCant, *The Cultural Contradiction of Fathers as Nonparents,* 21 Fam.L.Q. 127, 127–43 (1987); Guidubaldi, *et al., The Role of Selected Family Environment Factors in Post–Divorce Adjustment,* 34 Family Relations 141, 141–51 (1986); Jacobs, *"Fatherhood and Divorce: A Review of the Psychiatric Literature, in Divorce and Fatherhood,* at 3–9 (Jacobs ed. 1986); Wallerstein, *Children of Divorce,* 54 Am.J. Orthopsych. 444, 444–58 (1984); Nelson, *Coping with the Loss of a Father: Family Reaction to Death or Divorce,* 3 Journal of Family Issues 41, 41–60 (1982); Lamb, *Paternal Influences on Early*

reconsider the efficacy of the sole custody/visitation concept of post-divorce allocation of parental authority. The once universal norm of awarding sole custody in contested cases is being supplanted by a wide variety of shared parenting arrangements involving joint legal and/or physical custody following divorce.[9] Current research indicates that, while it may not be appropriate for everyone,[10] in appropriate cases shared custody options may significantly ameliorate the negative consequences of divorce for chil-

*Socio–Emotional Development,* 23 J.Ch.Psychol.Psychiat. 185, 185–90 (1982); Dominic & Schlesinger, *Weekend Fathers: Family Shadows,* 3 Journal of Divorce 241, 241–47 (1980); Rosenthal, *Sudden Disappearance of One Parent with Separation and Divorce,* 3 Journal of Divorce 43, 43–54 (1979); *accord* Hill, *Divorced Father, passim* (1989) (directed toward a popular rather than a professional audience); Silver & Silver, *Weekend Fathers, passim* (1981) (same).

9. Reidy, Silver, & Carlson, *Child Custody Decisions: A Survey of Judges,* 23 Fam.T.Q. 75, 82–86 (1989). *But see* Weitzman, *The Divorce Revolution,* Ch. 8 "Child Custody: From Maternal Preference to Joint Custody?," at 215–61 (1985) (discussing the persistance of maternal custody despite removal of the maternal preference).

10. Research indicates the level of pre- and post-divorce parental conflict is an important factor in determining the appropriateness of shared parenting options. *See* Johnston, Kline & Tschann, *Ongoing Postdivorce Conflict: Effects On Children Of Joint Custody And Frequent Access,* 59 Am.J. Orthopsych 576, 576–92 (1989); Steinman, Zemmelman & Knoblaugh, *A Study of Parents Who Sought Joint Custody Following Divorce,* 24 J.Am.Acad.Ch.Psych. 554, 554–62 (1985); Hauser, *Custody in Dispute,* 27 J.Am.Acad.Ch.Psych. 575, 575–82 (1985). We note, however, that research also indicates that even with parents in conflict, early intervention to facilitate the transition to new roles and to ensure compliance with set custody/visitation patterns may reduce conflict between the parents and stress for the children, thereby enhancing the potential for success of shared parenting options. *See* Alpert–Gillis, Pedro–Carrol & Cowen, *The Children of Divorce Intervention Program,* 57 J. Consult & Clin. Psych. 583, 583–89 (1989); Issacs, *The Visitation Schedule and Child Adjustment,* 27 Fam.Process 251, 251–56 (1988); McKinnon & Wallerstein, *A Preventative Intervention Program for Young Children in Joint Custody Arrangements,* 58 Am.J.Orthopsych. 168, 168–78 (1988); Hodges, Tierney & Buchsbaum, *The Cumulative Effect of Stress on Pre School Children of Divorced and Intact Families,* 46 Journal of Marriage and The Family 611, 615–16 (1984); *see also* Chamberlin, *Joint Custody,* Trial 25, 25–28 (April 1989); Scheppard, *Taking Children Seriously: Promoting Cooperative Custody After Divorce,* 64 Tx.L.Rev. 687, 687–788 (1985); Nestor, *Developing Cooperation Between Hostile Parents at Divorce,* 16 U.C. Davis L.Rev. 771, 771–75 (1983).

44

dren,[11] and for their parents.[12] There is evidence that shared parenting options may also lead to increased child support compliance by fathers.[13]

■ Pennsylvania courts have repeatedly recognized the value of joint physical and/or legal custody. *See Brown v. Eastburn*, 351 Pa.Super. 479, 480, 506 A.2d 449, 450–51

11. *See generally* Coller, *Joint Custody,* 27 Fam.Process 459, 459–69 (1988); Lowery, *Families After Divorce: Custody and Visitation,* Medical Aspects of Human Sexuality 55, 55–58 (Nov. 1988); Elkin, *Joint Custody: Affirming that Parents and Families Are Forever,* 32 Social Work 18, 18–24 (1987); Russell, *Shared Parenting,* 24 Early Child Development and Care 139, 139–53 (1986); Shiller, *Joint Versus Maternal Custody For Families with Latency Age Boys,* 56 Am.J.Orthopsych. 486, 486–89 (1986); Stahl, "A Review of Joint and Shared Parenting Literature," *in Joint Custody and Shared Parenting,* at 25–36 (Folberg ed. 1984); Irving, Benjamin & Trocme, *Shared Parenting: An Emperical Analysis Utilizing a Large Data Base,* 23 Family Process 561, 561–69 (1984); Phear, *et al.,* "An Emperical Study of Custody Agreements: Joint Versus Sole Legal Custody," *in Joint Custody and Shared Parenting, supra;* Rothberg, *Joint Custody: Parental Problems and Satisfactions,* 23 Family Process 43, 43–52 (1983); Ilfeld, Ilfeld & Alexander, *Does Joint Custody Work? A First Look at Outcome Data of Relitigation,* 131 Am.J.Psychiatry 61, 61–66 (1982); Ahrons, *Joint Custody Arrangements in Postdivorce Families,* 3 Journal of Divorce 189, 189–205 (1980); Abarbanel, *Shared Parenting After Separation and Divorce,* 49 Am.J.Orthopsych. 320, 320–29 (1979); Rosen, *Some Crucial Issues Concerning Children of Divorce,* 3 Journal of Divorce 19, 19–25 (1979); Wooley, *Shared Parenting Arrangements,* 1 Fam.Advocate 6 (1978); Grote & Weinstein, *Joint Custody,* 1 Journal of Divorce 43, 43–53 (1977).

12. Coysh, *et al., Parental Postdivorce Adjustment In Joint and Sole Physical Custody Families,* 10 Journal of Fam.Issues 52, 52–71 (1989); Tschann, Johnston & Wallerstein, *Resources, Stressors, and Attachment as Predictors of Adult Adjustment After Divorce: A Longitudinal Study,* 51 Journal of Marriage & Fam. 1033, 1033–46 (1989); Guttmann, *The Divorced Father,* 20 Journal of Comp.Fam.Studies 247, 247–61 (1989); Bowman & Ahrons, *Impact of Legal Custody Status on Father's Parenting Postdivorce,* 47 Journal of Marriage & The Family 481, 481–88 (1985); Koch & Lowery, *Visitation and the Non–Custodial Father,* 8 Journal of Divorce 47, 47–65 (1984); Greif, *Fathers, Children, and Joint Custody,* 49 Am.J. Orthopsych 311, 311–19 (1979).

13. *See* Seltzer, Schaeffer & Channg, *Family Ties After Divorce: The Relationship Between Visiting and Paying Child Support,* 51 Journal of Marriage and the Family 1013, 1013–32 (1989); Pearson & Thoennes, *Supporting Children After Divorce: The Influence of Custody on Child Support Levels,* 22 Fam.L.Q. 319, 319–39 (1988); Coller, *supra,* 27 Fam.Process at 463 ("most of the studies of joint custody relationships of both a legal and physical variety have found relative equity in the way child care expenses are divided, and extremely high compliance rates with child-support agreements").

(1986); *Murphey v. Hatala*, 350 Pa.Super. 433, 440–41, 504 A.2d 917, 921–22 (1986); *Ellingsen v. Magsamen*, 337 Pa. Super. 14, 21, 486 A.2d 456, 459 (1984); *In re Wesley J.K.*, 299 Pa.Super. 504, 509–10, 445 A.2d 1243, 1245–47 (1982). At the same time, Pennsylvania courts have recognized that joint custody is not reasonable or practicable in every case. *See Fisher v. Fisher*, 370 Pa.Super. 87, 535 A.2d 1163 (1988); *DeNillo v. DeNillo*, 369 Pa.Super. 363, 535 A.2d 200 (1987). Consequently, there is no *presumption* for or against joint custody. *See Schwarcz v. Schwarcz*, 378 Pa.Super. 170, 183 n. 16, 548 A.2d 556, 563 n. 16 (1988). Instead, trial courts are required to consider all factors which legitimately impact upon the child's physical, intellectual, moral and spiritual well-being *on a case by case basis* in deciding how to allocate post-divorce parental authority *via* legal and physical custody. *In re Davis*, 502 Pa. 110, 465 A.2d 614 (1983); *Rinehimer v. Rinehimer*, 336 Pa.Super. 446, 450, 485 A.2d 1166, 1168 (1984).

 Nonetheless, even when sole legal and physical custody is awarded to one parent, Pennsylvania courts scrupulously protect the non-custodial parent's right to maintain a meaningful parental relationship with his or her child. *In re Constance W.*, 351 Pa.Super. 393, 397–99, 506 A.2d 405, 407–08 (1986); *Fatemi v. Fatemi*, 339 Pa.Super. 590, 597, 489 A.2d 798, 801–02 (1985). During lawful periods of visitation a non-custodial parent has parental authority, and restrictions will only be imposed on that authority by consent, or upon clear demonstration that in absence of the proposed restriction, visitation will have a detrimental impact on the child. *In re Constance W., supra*, 506 A.2d at 408; *Fatemi v. Fatemi, supra*, 489 A.2d at 801. When a restriction is determined to be necessary, it must be the least intrusive restriction adequate to protect the specific interest identified. *In re Constance W., supra*, 506 A.2d at 408; *Fatemi v. Fatemi*, supra, 489 A.2d at 801–02 (collecting cases).

This solicitousness of the non-custodial parent's parental rights is in full accord with the developing constitutional

jurisprudence in this area. The custody, care, nurture, and instruction of children resides first in the childrens' natural parents, as a constitutionally recognized fundamental right. *See Lehr v. Robertson*, 463 U.S. 248, 257–61, 103 S.Ct. 2985, 2991–93, 77 L.Ed.2d 614, 623–29 (1983) (collecting cases). The statist notion that the government may supercede parental authority in order to ensure bureaucratically or judicially determined "best interests" of children has been rejected as repugnant to American traditions. *Parham v. J.R.*, 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979); *accord Meyer v. Nebraska*, 262 U.S. 390, 401– 02, 43 S.Ct. 625, 627–28, 67 L.Ed. 1042, 1046 (1923) (noting the models of Aristotelian guardianship and Spartan state collectivization of youth and rejecting those models as antithetical to American freedoms). Judges and state officials are deemed ill-equipped to second guess parents, and are precluded from intervening in absence of "powerful countervailing interests." *Lassiter v. Dept. of Soc. Serv.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159–60, 68 L.Ed.2d 640, 650 (1981).

It has been held that proof by clear and convincing evidence is required in proceedings to terminate parental rights. *Santosky v. Kramer* 455 U.S. 745, 769–70, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599, 617 (1982). It has also been repeatedly suggested, but not as yet decided, that a showing of *unfitness of the parent*, is constitutionally required to warrant *termination* of parental rights. *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511, 520 (1978); *see also Santosky v. Kramer, supra*, 455 U.S. at 760 n. 10, 102 S.Ct. at 1398 n. 10, 71 L.Ed.2d at 611 n. 10; *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14, 47–48 (1977) (Stewart, J.; joined by Burger, C.J. and Rehnquist, J.); *cf. In re: Coast*, 385 Pa.Super. 450, 459, 561 A.2d 762, 766–70 (1989).

C. *Parental Authority & Religious Freedom*

 The constitutionally recognized parental authority over the upbringing of children is augmented by the Free

Exercise and the Establishment Clauses of the First Amendment with regard to the *religious* upbringing of children. *See Employment Division v. Smith, supra,* —— U.S. at ——, 110 S.Ct. at 1602, 108 L.Ed.2d at 888 (explaining the hybrid nature of parental/religious rights of parents over their children's religious upbringing); *Wisconsin v. Yoder, supra,* 406 U.S. at 214–16, 92 S.Ct. at 1533, 32 L.Ed.2d at 24–25 (collecting cases); *see also Parham v. J.R., supra,* 422 U.S. at 603–04, 99 S.Ct. at 2504–04, 61 L.Ed.2d at 119; *West Virginia v. Barnette, supra,* 319 U.S. at 639–42, 63 S.Ct. at 1186–87, 87 L.Ed. at 1638–39; *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070, 1077–78 (1925). The United States Supreme Court has specifically held that parental authority in matters of religious upbringing may be encroached upon, only upon a showing of a "substantial threat" of "physical or mental harm to the child, or to the public safety, peace, order, or welfare." *Wisconsin v. Yoder, supra,* 406 U.S. at 230, 92 S.Ct. at 1540, 32 L.Ed.2d at 33.

### D. *Post–Divorce Parental Authority & Religious Freedom*

It was suggested, in *dicta,* in *Morris v. Morris,* 271 Pa.Super. 19, 412 A.2d 139 (1979), however, that *court* authority over children's religious upbringing is broader in *custody* cases, because:

> In matters of custody, the family unit has already been dissolved, and *that dissolution is accompanied by a weakening of the shield constructed against state intervention.* A parent cannot flaunt the banner of religious freedom and family sanctity when he himself has abrogated that unity.

412 A.2d at 143. (Emphasis added). This *dictum* from *Morris* has been criticized as failing to provide an adequate explanation of *why* parental rights recognized in *Wisconsin v. Yoder, supra,* would be weakened in the context of a post-divorce religious upbringing dispute, and as incorrectly implying that *parental* authority evaporates with the disso-

lution of the *spousal* relationships of the parents. *See* Magrum, *Exclusive Reliance on Best Interests May Be Unconstitutional*, 15 Creighton L.Rev. 25, 52 (1981); *accord* Zarowny, *The Religious Upbringing of Children After Divorce*, 56 Notre Dame Lawyer 160, 164 (1980) (noting *Morris*, criticizing the approach taken in *Morris*); Badal, *Child Custody: Best Interests of Children v. Constitutional Rights of Parents*, 81 Dickinson L.Rev. 733, 739 (1977) (noted, but not followed in *Morris*).[14]

The suggestion that parental authority is diminished *vis a vis* the *government* as the result of the dissolution of the parents' spousal relationship, however, would seem inconsistent with constitutional recognition of parental authority even where a spousal relationship between the parents never existed. *Caban v. Mohammed*, 441 U.S. 360, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 511 (1972). We note that the recent decision in *Michael H. v. Gerald D.*, 491 U.S. ——, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), turned upon the question of whether constitutionally protected parental rights had ever existed as to the biological parent of a child born of an adulterous affair; in holding that no such rights existed, the court carefully distinguished *Caban* and *Stanley*.

The *Morris dictum* also carries a tone of moral disapproval and an implicit penalization of divorce which is inconsistent with the enactment of "no-fault" divorce in this Commonwealth. Parents who "abrogate the unity of marriage" are not to be punished for their decision to divorce with denial of custody or the imposition of burdensome restrictions on visitation. Likewise, even assuming the

**14.** It is clear that constitutionally recognized parental authority is not extinguished by divorce, as parents have a right to procedural due process before *post-divorce* parental rights may be terminated. *See Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). It has also been suggested, but not decided, that parents may have a substantive due process right to the continuation of parental rights following divorce in absence of clear and convincing evidence of the parent's unfitness as a parent. *Lehr v. Robertson, supra,* 463 U.S. at 260, 103 S.Ct. at 2992, 77 L.Ed.2d at 625–26.

existence of some generalized "fault," the *dictum* is still inconsistent with the Supreme Court's affirmation in *Santosky v. Kramer, supra,* that "the fundamental liberty interest of natural parents in the care, custody, and management of their children does not evaporate simply because they have not been model parents...." 455 U.S. at 753, 102 S.Ct. at 1394–95, 71 L.Ed.2d at 606.

In a broader sense, we reject the logic of the distinction suggested in *Morris.* In intact families, parents are left to decide their children's "best interests" on an *ad hoc* basis. Significantly, "a marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals with a separate intellectual and emotional makeup." [15] One parent may be a Republican the other a Democrat, one may be a Capitalist the other a Communist, or one may be a Christian and the other a Jew. Parents in healthy marriages may disagree about important matters; and, despite serious, even irreconcilable, differences on important matters, the government could certainly not step in, choose sides, and impose an orthodox uniformity in such matters to protect judicially or bureaucratically determined "best interests" of the children of such parents. *See Parham v. J.R., supra.* Rather, intervention is permitted only upon a showing of a substantial risk of harm to the child in absence of intervention, and that the intervention proposed is the least intrusive means adequate to prevent the harm. *Wisconsin v. Yoder, supra.*

We find no reason to treat such disagreements between divorced parents differently. As harm to the children is the basis of the governmental justification for intervention, we cannot see how the marital status of the parents should affect the degree of harm to the child required to justify governmental intervention.

■ Under Pennsylvania law, each parent has parental authority during lawful periods of custody or visitation. Consequently, such a parent may pursue whatever course

---

**15.** *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349, 362 (1972).

of religious indoctrination which that parent sees fit, at that time, during periods of lawful custody or visitation. *Cf. In re Constance W., supra; Fatemi v. Fatemi, supra.* If the other parent objects and seeks restrictions, the objecting parent must establish a substantial risk of harm in absence of the restriction proposed. *Cf. Wisconsin v. Yoder, supra; In re Constance W., supra; Fatemi v. Fatemi, supra.*

Significantly, while divorce does not change the *standard* for legitimate government intervention in such matters, it may nonetheless lead to increased legitimate governmental intervention. Some divorced parents may conduct such religious upbringing disputes in a more acrimonious and injurious manner than parents who remain married, and thereby create greater risk of harm to their children in more such cases.[16] Additionally, as a practical matter, cumulative stress arising from the divorce generally, in

**16.** Parents who fail to develop appropriate conflict resolution skills for their post-spousal co-parenting responsibilities may exacerbate problems associated with parental conflict. *See generally* Forehand & McCombs, *The Nature of Interparental Conflict of Married and Divorced Parents,* 17 J. Abnormal Child Psych. 235, 235–49 (1989); Camera & Resnick, *Styles of Conflict Resolution and Cooperation Between Divorced Parents,* 59 Am.J. Orthopsych 560, 560–75 (1989). In cases where children have suffered serious negative consequences following their parents' divorce, high levels of pre-and post-divorce conflict have been identified as a significant causative factor. *See generally* Tchann, Johnston, & Wallerstein, *supra* at n. 12, 51 Journal of Marriage & The Family at 431–44; Webster–Stratton, *The Relationship of Marital Support, Conflict and Divorce to Parent Perceptions, Behaviors, and Child Conduct Problems,* 51 Journal of Marriage & The Family 417, 417–30 (1989); Forehand & McCombs, *supra,* 17 Journal of Abnormal Child Psychology at 235–49; Masten, *et al., Competence and Stress in School Children: The Moderating Effects of Individual and Family Qualities,* 29 Journal of Child Psychology and Psychiatry 745, 745–64 (1988); Long, *et al., Continued High or Reduced Interparental Conflict Following Divorce,* 56 Journal of Consulting and Clinical Psychology 467, 467–69 (1988); Johnston, Gonzalez, & Campbell, *Ongoing Postdivorce Conflict and Child Disturbance,* 15 Journal of Abnormal Child Psychology 493, 493–509 (1987); Shaw & Emery, *Parental Conflict and Other Correlates of Adjustment of School–Age Children Whose Parents Have Separated,* 15 Journal of Abnormal Child Psychology 269, 269–81 (1987); Long & Forehand, *The Effects of Parental Divorce and Parental Conflict on Children: An Overview,* 8 Developmental and Behavioral Pediatrics 292, 292–96 (1987); Woody, *et al., Child Adjustment to Parental Stress Following Divorce,* 65 Social Casework 405, 405–12 (1984); Emery, *Interparental Conflict and the Children of Discord and Divorce,* 92 Psychological Bulletin 310, 310–30 (1982).

particular cases, may create a situation where distress actually caused by a religious upbringing dispute tips an already teetering scale in favor of governmental intervention.[17] Any intervention, however, would have to be the least intrusive measures adequate to protect the interests identified. *See Wisconsin v. Yoder, supra; In re Constance W., supra; Fatemi v. Fatemi,* supra. This may mean that a court must address other constitutionally unprotected causes of stress before intervening in a religious dispute when cumulative stress is involved.

Consequently, we reject the *Morris dictum,* and its conclusion that the Supreme Court's ruling in *Wisconsin v. Yoder, supra,* was therefore inapplicable. We find that the requirement of a "substantial threat" of "physical or mental harm to the child" is applicable to proposed restrictions on a parent's post-divorce parental rights regarding the religious upbringing of his or her children. *See Wisconsin v. Yoder, supra; In re Constance W., supra; Fatemi v. Fatemi, supra.*

## II. Facts and Procedural History

The facts and procedural history of this case were set forth by the trial court in its opinion as follows:

Pamela S. Zummo (mother) and David S. Zummo (father) were married on December 17, 1978, separated August 1987, and divorced April 19, 1988. Three children were born of this marriage, namely Adam, age eight; Rachael, age four; and Daniel, age three. Mother was raised a Jew and has *actively* practiced her faith since childhood. Father was raised Roman Catholic but had attended Catholic services only *sporadically.* Prior to their marriage, mother and father discussed their religious differences and *agreed that any children would be raised in the Jewish faith.*

17. *See* Hodges, Tierney & Buchsbaum, *The Cumulative Effect of Stress on Pre-School Children of Divorced and Intact Families,* 46 Journal of Marriage and the Family 611, 611–17 (1984); *see generally,* note 16, *supra.*

During the marriage, the Zummo family participated fully in the life of the Jewish faith and community. They became members of the Norristown Community Jewish Center in 1983, celebrated Sabbath every Friday night and attended all of the high holiday services as well. In addition, mother and father participated in a social couples' group at their Synagogue and joined B'nai B'rith. All three of the children were formally given Hebrew names.

Before the parties separated, the children attended no religious services outside the Jewish faith. Adam will begin preparing for his Bar Mitzvah this fall. *Customary* instruction would require attendance at two classes each week after school, participation in Saturday services and attendance at Sunday School. This training will culminate in Adam's Bar Mitzvah at age thirteen. Rachael will begin her formal Jewish education and training this fall at Sunday School.

Since separation, father has refused to arrange for Adam's attendance to Sunday School while exercising visitation rights on alternate weekends. Father also wishes to take the children to *occasional* Roman Catholic services as he sees fit. Father suggests the children would benefit from a bi-cultural upbringing and should therefore be exposed to the religion of each parent. Mother opposes visitation by father to the extent it disrupts the formal Jewish training of the children. She further opposes exposing the children to a second religion which would confuse and disorient them.

Mother filed a divorce complaint on July 6, 1987, which included a count seeking confirmation of her custody of the children. *The parties have since agreed to share legal custody.* They have also agreed that *Mother should have primary physical custody subject to father's partial physical custody on alternating weekends,* as well as certain holidays and vacation periods. To this end, the parties submitted a Stipulation and Agreement setting forth the nature and timing of father's

partial physical custody. By virtue of the agreement, *the hearing and this Court's Order concerned itself only with the issues of to what extent father should be obligated to see to the attendance of the children at Jewish services during his visitation periods and whether father should be permitted to take the children to Roman Catholic services to the extent he attends on his visitation weekends.* Subsequent to hearing, it was determined that Adams's Saturday classes could be made up during the week so as not to interfere with father's visitation. Accordingly, the Court entered its Findings of Fact and Conclusions of Law along with its Order on May 6, 1988, which provided in pertinent part:

5. *Father shall be obligated during his weekend visitations to arrange for the children's attendance at their Synagogue's Sunday School,* however, father shall not be obligated to arrange for the attendance of the children at special education classes on Saturdays during his weekend visitations. This provision shall not be construed so as to prevent father from going on trips or attending special functions with his children during his weekend visitation provided, however, he provides reasonable notice to mother in advance thereof.

6. *Father shall not be permitted to take the children to religious services contrary to the Jewish faith,* however, this provision shall not be construed so as to prevent father from taking the children to weddings, funerals, or family gatherings and shall not be construed so as to prevent father from arranging for the presence of the children events involving family traditions at Christmas and Easter.

Father has appealed this Order to the Superior Court, asserting that his Constitutional rights and those of his children were violated by the Order.

*See Zummo v. Zummo,* 121 Montg.Co.L.R. 251, 251–53 (1988). (Emphasis added).

On appeal, our scope of review is broad in that we are not bound by deductions and inferences drawn by the trial court from the facts found, nor are we required to accept findings which are wholly without support in the record. On the other hand, our broad scope of review does not authorize us to nullify the factfinding function of the trial court in order to substitute our judgment for that of the trial court. Rather, we are bound by findings supported in the record, and may reject conclusions drawn by the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court. *See Karis v. Karis,* 518 Pa. 601, 608, 544 A.2d 1328, 1332 (1988); *Lombardo v. Lombardo,* 515 Pa. 139, 147–48, 527 A.2d 525, 529 (1987); *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 236–37, 478 A.2d 800, 805–06 (1984).

It is well-settled in Pennsylvania that custody and visitation matters between contending parents are to be decided on the basis of the judicially determined best interests of the child on a case by case basis, considering all factors which legitimately impact upon the child's physical, intellectual, moral and *spiritual* well-being. *In re Davis,* 502 Pa. 110, 465 A.2d 614 (1983); *Rinehimer v. Rinehimer,* 336 Pa.Super. 446, 450, 485 A.2d 1166, 1168 (1984). Unrestricted, however, this standard may yield results which encroach impermissibly upon constitutionally protected parental rights. When it is applied in the context of religious upbringing disputes, it may also encroach impermissibly upon constitutionally protected religious freedoms. This case involves a consideration of the constitutional limitations upon the application of the *spiritual* well-being component of the best interests analysis.

The trial court applied the best interests standard to the facts presented, and concluded that restrictions upon the father's right to expose his children to his religious beliefs were permissible and appropriate. The trial court noted several factors in support of the challenged restrictions: the Zummo's had orally agreed prior to their marriage that any children to their marriage would be raised as Jews;

during the marriage the children were raised as Jews; it was in the children's best interests to preserve the stability of their religious beliefs; the father's practice of Catholicism was only sporadic while the mother's practice of Judaism had been active; Judaism and Catholicism are irreconcilable; and, exposure to both religions might "unfairly confuse and disorient the children, and perhaps vitiate all benefits flowing from either religion." 121 Mont.Co.L.R. at 253–56. In support of each of these considerations the trial court points to this Court's opinion in *Morris v. Morris*, 271 Pa.Super. 19, 412 A.2d 139 (1979), as precedential authority. We find reliance upon *Morris* misplaced and consideration of *each* of the stated factors improper. We shall discuss each *seriatim*.[18]

### III. Reliance Upon Morris Misplaced

In 1979, a panel of this Court entered into a broad consideration of the role of courts in mediating post-divorce disputes concerning the religious upbringing of children. Review of the opinion, however, discloses that its *ratio decidendi* was quite narrow, and that the bulk of the opinion was in fact *orbiter dicta*, without binding prece-

**18.** The dissent suggests that this is not in fact a religious upbringing, parental rights dispute. Prior to the hearing those were the issues specifically framed by the parties. (R.R. at 29–31). Both the mother and the father focused their testimony on those issues. (R.R. at 62–67, mother; R.R. at 71–72, 76–78, 80 & 82, father; R.R. at 26–91, hearing). The trial court's findings, order, and opinion each addressed the father's concerns with that focus. (R.R. at 2–10, 13–20). The father's 1925(b) statement (R.R. at 11), brief, and argument to this Court had that focus. Indeed, the mother's brief and argument conceded that this was in fact a religious upbringing, parental rights dispute.

The narrow issues to be discussed were framed by the trial court's specific justifications for its restrictions, rather than the father's broad constitutional attack. Though the father's constitutional argument in the brief swept more broadly over the order as a whole, we feel constrained to address directly each of the factors identified by the court in justification of the challenged order as we ultimately agree in part with the father's broad challenge to the order. Moreover, if the trial court's stated grounds for the exercise of its discretion were constitutionally infirmed, then the order must be vacated, even if it could have been entered on constitutionally permissible grounds.

dential authority.[19]

The order challenged in *Morris* merely precluded the father, who was an active Jehovah's Witness, from dragging his daughter with him during his door-to-door proselytization efforts; *the challenged order in no way restricted the father's rights to communicate his beliefs to his daughter or to take her to church.* 412 A.2d at 147. As to the narrow issue actually presented for review, the decision in *Morris* was in complete accord with well-established precedent with regard to the court's authority to intervene to protect a child from the harmful effects of a parent's "martyr-like" practices, *regardless of the parents' marital status. See Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed.2d 645 (1944) (Jehovah's Witness proselytizing, parents married); *Commonwealth ex rel Derr v. Derr,* 148 Pa.Super. 511, 514, 25 A.2d 769, 770 (1942) (Jehovah's Witness proselytizing, parents divorced); *Commonwealth ex rel Kaufman v. Kaufman,* 69 Montg.Co.L.R. 292 (Pa. Cm.Pl.1953) (same). The *dicta* in *Morris,* which addressed broader issues not actually presented for review by this Court in that case regarding post-divorce religious upbringing of children, is entitled to *no* precedential effect, and only so much persuasive authority as its reasoning may compel.

## IV. Pre–Divorce Religious Training Agreements

In its opinion in support of the restrictions imposed, the trial court explained:

Though the *Morris* Court did not expressly rely upon the parents' original agreement to raise the children as Roman Catholics, it did include such agreement in the factual recitation and the existence of such an agreement or contract has been accorded significance in other custody decisions. *See e.g. Ackerman v. Ackerman, supra* [204 Pa.Super. 403, 205 A.2d 49 (1963)]. This Court attributes

---

**19.** Statements in an opinion which are not necessary to the decision are not binding authority. *Cassell's Estate,* 334 Pa. 381, 384, 6 A.2d 60, 61 (1939); *Cohens v. Virginia,* 6 U.S. (Wheat) 264, 399–400, 5 L.Ed. 257, 290 (1821); *Cf.* Cardozo, *Nature of Judicial Process,* at 29–30 (1921); Gray, *The Nature and Sources of Law,* at 261 (2nd.Ed.1921).

much significance to the similar agreement of the parties in this case.

*Zummo, supra,* 121 Mont.Co.L.R. at 255. We find reliance upon *Morris* and *Ackerman* misplaced, and the weight given the pre-divorce agreement improper.

In *Morris,* this Court merely noted the existence of an agreement in passing. There is nothing in *Morris* which vaguely suggests that such agreements are legally enforceable or that the existence of the agreement in any way effected this Court's determination in that case. Indeed, as noted above, the order challenged in *Morris* in no way restricted the father's right to communicate his beliefs to his daughter or to take her to non-Catholic services, *despite* the existence of the pre-divorce agreement noted.

In *Ackerman,* this court merely opined, in *dicta,* that *in absence of such an agreement,* there could be no justification to force the custodial parent to raise the children involved as Jews rather than as Protestants. 205 A.2d at 51–52. At most, *Ackerman* held that the presence of such an agreement would present a different situation than was presented in that case, it could not decide an issue concededly not presented in that case. Thus, *Ackerman* has no precedential authority on this issue.

The suggestions of possible weight to be given to such agreements contained in *Morris* and *Ackerman* are counterbalanced to some extent by contrary authority in other cases. In several cases this Court has indicated that such agreements were not controlling or had they been given undue weight. *See e.g. Commonwealth v. English,* 194 Pa.Super. 25, 166 A.2d 92 (1960); *Commonwealth ex rel. Kelly v. Kelly,* 83 Pa.Super. 14 (1924); *Commonwealth v. McClelland,* 70 Pa.Super. 273 (1918). None of these cases, however, addressed directly the question of whether such an agreement could properly be enforced or be given weight over the objections of one of the parties to the agreement.

█ Our research discloses only one published decision in Pennsylvania directly addressing the issue of whether a

pre-divorce agreement regarding the religious upbringing of children may be given legal effect over the objections of one of the parties to the agreement. *See Freidman v. Aspen,* 15 Chester Co. Rptr. 236, 237–40 (Pa.Cm.Pl.1967). In *Freidman,* Judge Kurtz reviewed the decisions of our sister states and the opinions of several learned commentators and concluded that such agreements were *not* legally enforceable.

Following the same path, and carrying the review forward to the present, we reach the same conclusion. We note that the authorities establish several persuasive grounds upon which to deny legal effect to such agreements:

1) such agreements are generally too vague to demonstrate a meeting of minds, or to provide an adequate basis for objective enforcement;

2) enforcement of such an agreement would promote a particular religion, serve little or no secular purpose, and would excessively entangle the courts in religious matters; and,

3) enforcement would be contrary to a public policy embodied in the First Amendment Establishment and Free Exercise Clauses (as well as their state equivalents) that parents be free to doubt, question, and change their beliefs, and that they be free to instruct their children in accordance with those beliefs.

*See Freidman v. Aspen, supra,* 15 Chester Co.L.Repts. at 237–40; *Hacket v. Hacket,* 150 N.E.2d 431, 433–40 (Ohio App.1958) (citing numerous authorities); *Stanton v. Stanton,* 213 Ga. 545, 100 S.E.2d 289, 292–93 (1957) (collecting cases); *McLaughlin v. McLaughlin,* 20 Conn.App. 278, 132 A.2d 420, 421–22 (1957) (collecting authorities); *Lynch v. Uhlenhopp,* 248 Iowa 68, 78 N.W.2d 491, 499–50 (1957) (collecting cases); *see generally* Annotation, *Religion as a Factor in Child Custody and Visitation Cases,* 22 ALR4th 971, 1028–39 (1983 & 1988 supp.) (§§ 15, 16) (collecting and analyzing cases); Note, *The Establishment Clause and Religion in Child Custody Disputes,* 82 Mich.L.Rev. 1702,

1726 & nn. 79–81 (1984) (same); Mangrum, *Exclusive Reliance on Best Interests May Be Unconstitutional: Religion As A Factor In Child Custody Cases,* 15 Creighton L.Rev. 25, 25–82 (1981) (same); Zarowny, *The Religious Upbringing of Children After Divorce,* 56 Notre Dame Lawyer 160, 165–66 & nn. 54–64 (1980) (same); Badal, *Child Custody: Best Interests of Children v. Constitutional Rights of Parents,* 81 Dickinson L.Rev. 733, 733–54 (1977) (same).[20]

The first two grounds for denying legal effect arguably overlap. Vague parental agreements regarding religious upbringing of their children may result in greater entanglement as a result of their vagueness. Both grounds are clearly demonstrated here.

In this case the parents *orally* agreed prior to their marriage that any children they might have would be raised as Jews. (R.R. at 43–44, 51). The parents, not surprisingly, had different understandings of this vague agreement. The mother understood the agreement to envision intense and exclusive Jewish religious indoctrination with exposure to only the most secular aspects of the father's Italian/Catholic heritage. (R.R. at 46–47, 52, 57–61, 64–65). The father on the other hand explained that while he understood that their informal agreement envisioned that his children would receive formal Jewish education, he did not understand it to preclude him from exposing the children to Catholic mass and other aspects of his cultural and

**20.** *See also* Inker, *Religion as a Factor in Custody Cases,* Boston Bar.J. 7, 8–9 (November 1961) (same); Smith, *Contracts for Religious Education of Children,* 7 Cleve–Marsh L.Rev. 534, 534–40 (1958) (same); Comment, *Parent's Rights to Prescribe Religious Education of Children,* 3 DePaul L.Rev. 83, 88–89 (1953) (same); Note, *Enforceability of Antinuptial Contracts in Mixed Marriages,* 50 Yale L.J. 1286, 1286–94 (1941) (same); Freidman, *The Parental Right to Control the Religious Education of a Child,* 29 Harv.L.Rev. 485, 500 (1916) (same). We have reviewed the contrary authorities, especially the New York decisions, and find them to be unpersuasive on this point. *See generally* Annotation, *supra,* 21 ALR4th at 1034–39 (§ 16a). We note that no New York decision enforcing such agreements over the objections of one of the parties has been reviewed by the United States Supreme Court. Consequently, their constitutionality remains in doubt.

religious heritage on a periodic basis. (R.R. at 72).[21] The indefiniteness of the instant *oral* agreement precludes enforcement on ordinary contract principles as it demonstrates no meeting of minds on the critical issues of the exclusivity and intensity of the Jewish education envisioned by the parties, and it does not provide an objective basis for enforcement of any specific terms of the agreement.[22]

The problem of indefiniteness in the agreement is not surmounted by the trial court's characterization of the mother's intended course of instruction as "customary." 121 Mont.Co.L.R. at 252. The mother testified with acknowledged uncertainty as to her current Synagogue's religious education program, and made no attempt to establish that the intensity or exclusivity of the instruction now sought was "customary" for children of intermarriage being raised as Jews, or for Jewish children generally. (R.R. at 56–62). Cursory review of available authorities reveals broad diversity, rather than narrow custom, in the intensity and exclusivity of the religious education of children of intermarriage being raised as Jews [23] and of Jewish children generally.[24]

**21.** While the trial court was free to reject the father's claim of a different understanding of the agreement, it is apparent that it did not. The trial court's only expression on the subject of credibility was that the mother and the father were "two intelligent, open and honest people who have been entirely candid up here today, and—." (R.R. at 57). Moreover, the mother confirmed the existence of conflict between she and the father during the marriage as to the scope of the agreement. (R.R. at 50, 62–67).

**22.** It has been suggested that this obstacle to enforcement might be surmounted by an appropriately drawn formal *written* agreement. *See* Erstenoff, *Forcing Rites on Children,* 1 Am.Fam. 13, 14–15 (1987). Such is not the case here. Moreover, even New York, which will enforce some such agreements, requires first that they be in writing. *See Stevenot v. Stevenot,* 133 A.D.2d 820, 520 N.Y.S.2d 197 (1987).

**23.** *See generally* Schneidner, *Intermarriage,* at 135–72 & *passim* (1989); Petsonk & Remsen, *The Intermarriage Handbook,* at 177–255, 277–86, 297–307 & *passim* (1988); Heller, *Talking to Your Children About God,* at 141–56 (1988); Rosenberg, Meehan, Payne, *Happily Intermarried,* at 132–45 & *passim* (1987); Cowan & Cowan, *Mixed Blessings,* at 127–266 & *passim* (1987); Gruzen, *How to Raise Your Jewish/Christian Child, passim* (1985); Mayer, *Love and Tradition, supra,* at 243–77 & *passim.*

**24.** *See generally* Petsonk & Remsen, *The Intermarriage Handbook, supra* at n. 23, at 277–86 (noting differences within and between

Moreover, there is absolutely no evidence that the mother had informed the father of either the intensity or the exclusivity of the intended Jewish education of their children at the time the father agreed orally to raise any future children as Jews. The mother conceded that after the children were born but before the divorce, the father had sought to expose the children and the mother to Catholic mass, and that the mother did "give in" once. (R.R. at 50, 62–67). Thus, it is far from clear whether the father's intent to expose the children to Catholicism with occasional attendance at Catholic mass would violate the premarital agreement.[25]

The excessive entanglement[26] difficulties are also manifest in the instant case. The father is prohibited from taking his children to "religious services contrary to the Jewish" faith. What constitutes a "religious service?" Which are "contrary" to the Jewish faith? What for the matter is the "Jewish" faith? Orthodox, Conservative, Reform, Reconstructionist, Messianic, Humanistic, Secular and

Jewish sects with regard to Jewish education); Pilch, "Jewish Religious Education," *in Religious Education*, at 382–95 (Taylor ed. 1960) (same, also tracing history and development of Jewish religious education); *see also The Hadassah Magazine Jewish Parenting Book*, *passim* (1989); Kaplan, *Jewish Education with and Beyond the Book*, 53 Jewish Spectator 11, 11–14 (Spring 1988); Fishman, *Jewish Education*, 65 Journal of Jewish Communal Service 23, 28–37 (1988); Phillips & Zeldin, *Jewish Education as Communal Activity*, 64 Journal of Jewish Communal Service 123, 123–27 (1987); Spiro, *Formative Process in Jewish Tradition*, 82 Religious Education 547, 547–54 (1987); London & Frank, *Jewish Identity and Schooling*, 64 Journal of Jewish Communal Service 4, 4–13 (1987); Cohen & Musnikow, *Jewish Early Childhood Education*, 50 Jewish Education 29, 29–31 (1982). We note that pluralism is regarded by some authorities as an important aspect of Jewish religious education. *See e.g.* Greenberg, *Pluralism and Jewish Education*, 81 Religious Education 19, 19–28 (1984).

**25.** The father testified that he had no intent to interfere with his children's religious education as Jews, or to convert them to Catholicism. (R.R. at 76–77). There is not the slightest suggestion of any contrary unstated intent in the record here on appeal. *See* n. 21, *supra.*

**26.** *See generally Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 211, 29 L.Ed.2d 745, 755–56 (1971) (explaining the excessive entanglement concept); *see also Jimmy Swaggart Ministries v. Board of Equalization*, —— U.S. ——, ——, 110 S.Ct. 688, 697–98, 107 L.Ed.2d 796, 811–12 (1990) (collecting cases and authorities).

other Jewish sects might differ widely on this point.[27] An exemption is provided for weddings, funerals, and "family gatherings and events involving family traditions at Christmas and Easter." How does one determine which events are "family gatherings or events?" How does one determine when a practice becomes a "tradition?" How broadly are "Christmas" and "Easter" defined? Do they include Advent? Epiphany? Lent? The Ascension? Pentecost? Both the subject matter and the ambiguities of the order make excessive entanglement in religious matters inevitable if the order is to be enforced.

Finally, there is a broader and more fundamental entanglement problem with enforcement of such agreements. Enforcement plainly encroaches upon the fundamental right of individuals to question, to doubt, and to change their religious convictions, and to expose their children to their changed beliefs.

The constitutional freedom to question, to doubt, and to change one's convictions, protected by the Free Exercise and Establishment Clauses, is important for very pragmatic reasons. For most people religious development is a lifelong dynamic process even when they continue to adhere to the same religion, denomination, or sect.[28] It is also generally conceded that the transmission and inculcation of religious beliefs in children is both active and passive, is shared by both parents, and is affected by a wide variety of

**27.** *See* Petsonk and Remsen, *The Intermarriage Handbook, supra* at n. 23, at 277–86 & 334–79 (describing the different positions on religious education and other matters taken by various Jewish sects); Pilch, *supra* at n. 24, at 382–95 (same); *see generally The Encyclopedia of American Religions,* at 667–81 (2nd Ed.1987) (describing various Jewish sects).

**28.** *See generally* Elkind, "The Development of Religious Understanding in Children," *in Research on Religious Development,* at 655–85 (1971) (noting stages of religious development); *see also* Potvin & Lee, *Adolescent Religion: A Developmental Approach,* 43 Sociological Analysis 131, 131–44 (1982) (same); *accord* Petsonk and Remsen, *The Intermarriage Handbook, supra* at n. 23, at 183–211 (noting the stages of religious development); Kushner, *When Children Ask About God,* at 25–35 (1971) (same).

external factors.[29] Importantly, it is also generally acknowledged that it would be difficult, if not impossible, for an interreligious couple engaged to be married to project themselves into the future so as to enable them to know how they will feel about religion, if and when their children are born, and as the children grow; and that it would be still more difficult for such a couple to attempt to project themselves into the scenario of a potential divorce after children were born, in order to accurately anticipate the circumstances under which religious upbringing agreements would be enforced if such agreements were given legal effect. *See* Coller, *Joint Custody: Theory, Research and Policy,* 27 Family Process 459, 465 (1988); Landis, *Marriages of Mixed and Non–Mixed Religious Faith,* 14 Am.Soc.Rev. 401, 404–05 (1949).[30] Consequently, while reli-

**29.** *See generally* Clark, Worthington, & Danswer, *The Transmission of Religious Beliefs and Practices from Parents to Firstborn Early Adolescent Sons,* 50 Journal of Marriage and the Family 463, 463–72 (1988); McAllister, *Religious Change and Secularization,* 40 Sociological Analysis 249, 249–63 (1988); Cornwall, *The Social Bases of Religion: A Study of Factors Influencing Religious Belief and Commitment,* 29 Review of Religious Research 50, 50–56 (1987); Kieren & Munro, *Following the Leaders: Parents' Influence on Adolescent Religious Activity,* 26 Journal for the Scientific Study of Religion 249, 249–55 (1987); Dudley & Dudley, *Transmission of Religious Values from Parents to Adolescents,* 28 Review of Religious Research 3, 3–15 (1986); Hunsberger, *Parent–University Student Agreement on Religious and Non–Religious Issues,* 24 Journal of the Scientific Study of Religion 314, 314–41 (1985); Hoge, Petrillo & Smith, *Transmission of Religious and Social Values From Parent to Teenage Children,* 44 Journal of Marriage and the Family 569, 569–80 (1982); Nelson, *Religious Transmission Versus Religious Formation,* 21 Sociological Quarterly 207, 207–18 (1980); Carey, *Influences of Peers in Shaping Religious Behavior,* 10 Journal for the Scientific Study of Religion 157, 157–59 (1971).

**30.** Respected sociologists Monica McGoldrick and Nydia Garcia–Preto have explained:

Ethnicity interacts with the family life cycle at every stage. When conflicts about one's ethnic identity interact with life cycle transitions, the stresses inherent in all changes are compounded. *When we go through life cycle changes, we need our cultural identity most; it provides us with the rituals, the symbols, and the context of familiar meanings that cushion those changes for us.* All situational

gious upbringing agreements may serve an important and beneficial purpose by promoting careful consideration of potential difficulties prior to marriage, and also may carry moral weight and religious sanction, parties entering into such agreements generally will not be able to anticipate the fundamental changes in circumstances between their prenuptial optimism, their struggles for accommodation, and their ultimate post-divorce disillusionment. Consequently, a hopeful and perhaps naive prenuptial assurance of a future commitment to an agreed (usually vague) course of religious instruction for then as yet unborn children in the event of divorce (an often unconsidered possibility), must remain as legally unenforceable in civil courts as the wedding vows the parties even more solemnly exchanged. *Cf. Witmayer v. Witmayer,* 320 Pa.Super. 372, 380, 467 A.2d 371, 375 (1983) (if circumstances change, the terms of an informal separation agreement should not be enforced); *Taylor v. Taylor,* N.Y.L.J., at 21 (Dec. 21, 1989), *digested in* 16 FLR 119 (1989) (wedding vows express a mere future expectation; consequently, a husband is not liable for damages in fraud following divorce for breach of his wedding vows).

crises—*divorce,* illness, job loss, retirement, and death—can compound ethnic identity conflicts, ...

\* \* \* \* \* \*

*Couples typically anticipate at the beginning of their relationship that they can overcome all odds in marriage.*
... *one spouse may fuse into the other's family by* religious conversions, ..., or by *adopting the accoutrements of the other's culture.* It is unfortunately rare for intermarried couples to remain open to both extended families and to keep their own cultural traditions.

\* \* \* \* \* \*

*A spouse who marries out* ... and raises children without teaching them his or her native language or cultural traditions *may later regret that decision,* as the children grow up with little sense of [his or her suppressed] ethnic identity. A spouse who leaves her or her country of origin to marry may later experience painful longing for homeland and roots. *The implications of the decision to marry out may only be appreciated many years later,* particularly if the need for a supportive and familiar context intensifies.
McGoldrick & Preto, *Ethnic Intermarriage,* 23 Family Process, 347, 347–48, 352, & 357 (1984) (emphasis added); *accord* Gruzen, *Raising Your Jewish Christian Child, supra,* at 7–8.

The First Amendment specifically preserves the essential religious freedom for individuals to grow, to shape, and to amend this important aspect of their lives, and the lives of their children. Religious freedom was recognized by our founding fathers to be *inalienable*. It remains so today. Thus, while we agree that a parent's religious freedom may yield to other compelling interests, we conclude that it may not be bargained away.

The great weight of legal authority is against enforcement of such agreements over the objections of one of the parties. Without exhausting all of the arguments suggested in the cases and commentaries in support of this position, we find we are fully persuaded of its correctness. We note that in recent years psychologists and theologians have specifically questioned the wisdom of such agreements and attempts at their enforcement.[31] We also note that the trend is away from the use of such agreements.[32]

We conclude that the trial court erred in giving the oral pre-nuptial agreement "much significance." In this context, it was entitled to *none*. The decision to grant it such weight was constitutionally impermissible and an abuse of discretion.

## V. The Children's Pre–Divorce Religious Training

The trial court stated that the children had been "assiduously" grounded in the Jewish faith, and the children should be permitted to continue in "their chosen faith."

31. Schneidner, *Intermarriage,* at 131 (1989); Rosenberg, Meehan, & Payne, *Happily Intermarried,* at 134–35 (1988); Gruzen, *Raising Your Jewish/Christian Child,* at 8–9, 78 (1985); Sandmel, *When a Jew and Christian Marry,* at 118–19 (1977).

32. Ellman, *Intermarriage in the United States: A Comparative Study of Jews and Other Ethnic and Religious Groups,* 49 Jewish Social Studies 1, 7 (1987) (noting the trend away from the use of such agreements); *The Code of Canon Law,* Canon 1125, at 802 (Coriden, Green, & Heintschel eds. 1985) (explaining that the non-Catholic partner in a mixed marriage seeking the sanction of the Catholic Church is no longer required to make an agreement to raise any children of the marriage as Catholics); Doyle, *The Roman Catholic Church And Mixed Marriages,* 14 Ecumenical Trends 81, 81–84 (1985) (same). *But see* Erstenoff, *supra* at n. 22, 1 Am.Fam. at 14–15 (recommending specific written prenuptial religious training agreements).

121 Mont.Co.L.Rept. at 255, 256. In effect, the trial court concluded that the *three, four,* and *eight*-year old children in this case had asserted personal religious identities which were entitled to consideration and protection. We cannot agree.

In fact, the mother expressly conceded that her childrens' Jewish religious education *had just begun:*

At Rachael's stage they're, *they are just introducing them* to the various holidays.

At Adam's stage, *they are beginning* to learn Hebrew, to identify with other Jews, you know, Jewish kids; basically identify themselves as Jews; *they are starting to learn* the prayers. It's the whole foundation *so that they can build upon that later.*

(R.R. at 37). (Emphasis added). The youngest child Daniel, age three, had not yet even begun religious training. Consequently, notwithstanding the deference which trial court's findings are entitled, we find the record *contradicts* rather than *sustains* the characterization of these children as having been "assiduously" grounded in Judaism at this early stage of their lives.

Similarly, we find no basis for the trial court's characterization of Judaism as *the children's* "chosen faith." Adam and Rachael "mentioned" (not complained) that their father had taken them to Catholic services, rather than Jewish Sunday School during visitation. (R.R. at 30). There is no evidence of any present distress on the part of the children arising their father's actions in exposing them to Catholicism. There was *no* evidence that any of the children asserted a personal religious identity for themselves. Significantly, none of the children were called to testify on this, or any other subject, in the trial court.

Commonly, parents and religious leaders define a child's religious identity under the rules of the religion they practice. Often such rules impose a presumed religious identity upon a child without requiring the child's consent or understanding, on the basis of a parent's religion, circumcision and naming of the child, infant baptism, the child's Sunday

school attendance or similar factors. Different groups follow different rules even within religions, and many expressly reject the rules of other groups. To accept one set of rules over another is clearly impermissible. The First Amendment forbids civil courts to enter into *Halachic* disputes as to when a child may be deemed a Jew,[33] or to give any weight or consideration to religious rules or customs in such matters. Succinctly, *secular* courts must confine their analysis to the *secular* law, and leave the implications of religious law, rules, or customs to the internal tribunals of the various religious groups which recognize such rules. *Employment Division v. Smith, supra,* —— U.S. at ——, 110 S.Ct. at 1603, 108 L.Ed.2d at 889; *Jones v. Wolf, supra; Serbian Eastern Orthodox Diocese v. Milivojevich, supra; Presbyterian Church v. Hull Church, supra; Watson v. Jones, supra.* Secular courts know no orthodoxy in such matters. *West Virginia v. Barnette, supra; see also* Note, *supra,* 82 Mich.L.Rev. at 1716 n. 49 (collecting United States Supreme Court cases).

In order to avoid arrogating to itself unconstitutional authority to declare orthodoxy in determining religious identity, courts only recognize a *legally* cognizable religious identity when such an identity is asserted by the child itself, and then only if the child has reached sufficient maturity and intellectual development to understand the significance of such an assertion. Though no uniform age of discretion is set, children twelve or older are generally considered mature enough to assert a religious identity, while children eight and under are not. With those ranges as a starting point, judges exercise broad discretion on a case by case basis in determining whether a child has sufficient capacity to assert for itself a personal religious identity. *See* Note,

**33.** *See* Selzer, *Intermarriage and the Courts,* Humanistic Judaism 28, 32–33 (Autumn 1982) (criticizing a New York decision for doing just that); Glaser, "Reform Jewish View of a Court Ruling," *New York L.J.,* at p. 26 (Dec. 2, 1977) (same); *Compare* Schaalman, *Patrilineal Descent,* 97 Cent.Conf.Am.Rabbis 110, 110–11 (1988) (a Reform Jew's perspective) *and* Cohen, *The Conversion of Children Born To Gentile Mothers And Jewish Fathers,* 22 Tradition 1, 1–7 (1987) (an Orthodox Jew's perspective).

*supra,* 82 Mich.L.Rev. at 1727–32 & nn. 85–109 (especially at 1730 n. 100, collecting cases); Magrum, *supra,* 15 Creighton L.Rev. at 56–57 & nn. 157–82; *see also* n. 28, *supra* (regarding the development of religious understanding and identity).

Here, the children, ages three, four, and eight-years old, were too young to assert a religious identity for themselves. In fact, they made no attempt to do so. *Cf. Zucco v. Garrett,* 150 Ill.App.3d 146, 103 Ill.Dec. 558, 563, 501 N.E.2d 875, 880 (1986) (without evidence of the child's personal preferences, the question of sufficient maturity does not even arise).

Moreover, even if the children had expressed a personal religious identity it is not clear that the children would have had any constitutional right to resist, or to be protected from, attempts by either parent to exercise their constitutional rights to inculcate religious beliefs in them contrary to their declared preferences prior to their legal emancipation. In *Wisconsin v. Yoder, supra,* the majority declined to reach the issue of whether children had constitutional rights pertaining to religious education which could be asserted against parents, though the majority expressed concerns suggesting they were not predisposed to favor a claim to such rights. 406 U.S. at 231–32, 92 S.Ct. at 1541, 32 L.Ed.2d at 34. In *dicta,* in *Parham v. J.R., supra,* a majority strongly suggested, with citation to *Meyer v. Nebraska, supra,* and *Pierce v. Society of Sisters, supra,* that no such rights existed, in rejecting an analogous claim regarding a child's challenge to parental decision regarding medical treatment. 442 U.S. at 603–04, 99 L.Ed.2d at 2504–05, 61 L.Ed.2d at 119.[34] As the children themselves asserted no such rights, we need not decide the issue here.

We conclude that whatever religious training the three, four, and eight year-old children had received, they lacked

**34.** If a conflict between parent and child presented a substantial threat of physical or mental harm, restrictions could then, of course, be considered on that ground. *Wisconsin v. Yoder, supra. See, infra* at Part IX.

capacity to assert a legally cognizable religious identity and, in fact, made no attempt to assert such an identity; consequently, no legally cognizable religious identity had been acquired. Consideration of the children's presumed religious identity, under the circumstances presented here, was constitutionally impermissible and an abuse of discretion.

### VI. Stability of Children's Religious Beliefs

■■■ The trial court also opined that "stability and consistency in a child's religious inculcation has been recognized as an important factor in determining the best interests of a child...." *Zummo, supra,* 121 Mont.Co.L.Rept. at 254. Though reliance upon the *dicta* from *Morris* is again understandable, it is nonetheless again misplaced.

This Court has noted in several cases that stability with regard to with whom the children live, and where the children live, is an important consideration in custody/visitation cases. *See e.g. Lozinak v. Lozinak,* 390 Pa.Super. 597, 603, 569 A.2d 353, 355–56 (1990); *Fisher v. Fisher, supra,* 535 A.2d at 1166 (citing cases); *Commonwealth ex rel. Oxenreider v. Oxenreider,* 290 Pa.Super. 63, 434 A.2d 130 (1981) (collecting cases). In *dicta* in *Morris,* this Court suggested that *stability in spiritual inculcation* was also favored in the best interests analysis. 412 A.2d at 141–42. The trial court in this case relied, in part, upon that *dicta* in imposing the challenged restriction. *Zummo, supra,* 121 Mont.Co.L.Rept. at 254.

We need not decide here the extent to which greater compatibility, religious or otherwise, may be considered in awarding primary physical custody. We are compelled, however, to expressly disavow the suggestion in *Morris* that *governmental* interests in maintaining stability in *spiritual inculcation* [35] exist which could provide a justification to encroach upon constitutionally recognized parental authority and First Amendment Free Exercise rights of a

**35.** We note that stability was set forth in the trial court opinion as a separate consideration from the alleged emotional/spiritual harm justification for the restriction imposed. Though related and perhaps overlapping, we discuss the justifications separately.

parent to attempt to inculcate religious beliefs in their children. Notwithstanding the genuine comfort and reassurance a child *may* derive from *any* religion in a time of turmoil like divorce, the government simply cannot constitutionally prefer stability in religious beliefs to instability.

Stability in a path to damnation could not be said to be more in a child's "best interests" than an instability which offered the hope of movement toward a path to eternal salvation. Similarly, if all religions or a particular religion were merely harmful and repressive delusion, then stability in such a delusion could not be said to be more in a child's "best interests" than instability which might pave the way to escape from the delusion. Because government cannot presume to have any knowledge as to which if any religions offer such eternal rewards or repressive delusions, and may not declare the complete absence or the universality of such eternal rewards or repressive delusions, a child's "best interests" with regard to the *spiritual* aspect of religion cannot be determined by any governmental authority.

The essence and importance of religious freedom in this respect is illustrated in Robert Bolt's dramatization of the clash between King Henry VIII and Chancellor Thomas More in *A Man For All Season's* (1962), wherein the following poignant exchange occurs:

NORFOLK. Oh, confound all this! (With real dignity.) I'm not a scholar, as Master Cromwell never tires of pointing out, and frankly I don't know whether the marriage was lawful or not. But damn it Thomas, look at those names. You know those men. Can't you do what I did, and come with us, for fellowship?

MORE. (Moved). And when we stand before God, you are sent to Paradise for doing according to your conscience, and I am damned for not doing according to mine, will you come with me, for fellowship?

CRANMER. So those of us whose names are there are damned, Sir Thomas?

MORE. I don't know, Your Grace. I have no window to look into another man's conscience. I condemn no-one.

CRANMER. Then the matter is capable of question?

MORE. Certainly.

CRANMER. But that you owe obedience to your King is not capable of question. So weigh a doubt against a certainty—and sign.

MORE. Some men think the earth is round, others think it flat; it is a matter capable of question. But if it is flat, will the King's command make it round? And if it is round, will the King's command flatten it? No, I will not sign.

Act II, scene 5 at 105. No more today than then, can government know or alter the ultimate truth in matters of religion. Rather, it is apparent that the government is inherently and constitutionally incompetent to determine whether stability or instability in religious beliefs would be in the best interests of a child. *See Zucco v. Garrett,* 150 Ill.App.3d 146, 103 Ill.Dec. 558, 563–64, 501 N.E.2d 875, 880–81 (1986); *Quiner v. Quiner,* 59 Cal.Rptr. 503, 516–18 (1967); *cf. Employment Division v. Smith, supra; County of Allegheny v. ACLU, supra; Jones v. Wolf, supra; West Virginia v. Barnette, supra; cf.* Paul, *The Impact of Spiritual Custody Awards on the Free Exercise Rights of Parents,* 138 U.Pa.L.Rev. 583, 610 (1989) (citing cases).

Moreover, the prohibition on preferring some religion to none, may not be avoided by suggesting that religion or religious stability is only being considered because of the *secular* rather than *spiritual* benefits expected to arise from protecting the stability of a child's religious beliefs. We are aware of the wide body of research which suggests that religiosity may be linked to various physical, intellectual, emotional, and moral benefits.[36] While different benefits

**36.** *See e.g.* Thornton & Camburn, *Religious Participation and Adolescent Sexual Behavior and Attitudes,* 51 Journal of Marriage & the Family, 641, 641–53 (1989); Chamberlain & Zika, *Religiosity, Life Meaning, and Well-being,* 27 Journal for the Scientific Study of Religion 411, 411–20 (1988); Schmidt, *Moral Values of Adolescents: Public Versus Christian Schools,* 7 Journal of Psychology & Christianity 50, 50–54 (1988); Zern, *The Relationship of Religious Involvement To a Variety of Indicators of Cognitive Ability and Achievement in College Students,* 22 Adolescence 883, 883–95 (1987); Harmon, *The Relation-*

may vary between and among religions and sects, and while adherents of the same religion or sect may vary widely in their degrees of religiosity generally or at particular times,[37] we find that even assuming that some religion may lead to more secular benefits than no religion generally, the First Amendment as construed by the United States Supreme Court nonetheless precludes a preference for some religion over none, regardless of the *secular* benefits presumed to be at stake. · *Allegheny County v. ACLU, supra.* The exclusion of the benefits of stability in religious inculcation and of religiosity in general are apparently part of the price which must be paid for religious freedom and constitutional recognition of parental rights.

Thus, we conclude that while the desire to provide or maintain stability in the already tumultuous context of a divorce is generally a significant factor in custody determinations, courts constitutionally cannot have any interest in the stability of a child's religious beliefs. The consideration of the childrens' presumed interests in. spiritual stability was constitutionally impermissible and an abuse of discretion.

## VII. Relative Parental Devoutness

 In both the trial court's statement of the facts and in the discussion section of the trial court's opinion, the trial court contrasted the mother's "active" participation in Jew-

*ship Between Religiosity and Health,* 9 Health Values 23, 23–25 (1985); Peterson & Roy, Religiosity, *Anxiety, Meaning and Purpose,* 27 Review of Religious Research 49, 49–62 (1985); Witter, *et al., Religion and Subjective Well-being in Adulthood,* 26 Review of Religious Research 332, 332–42 (1985) (analyzing 28 prior studies); Hadaway, Elifson, & Peterson, *Religious Involvement and Drug Use Among Urban Adolescents,* 23 Journal of the Scientific Study of Religion 109, 109–28 (1984); St. George McNamara, *Religion, Race, and Psychological Well-being,* 23 Journal for the Scientific Study of Religion 351, 351–63 (1984); Tittle & Welch, *Religiosity & Deviance,* 61 Social Forces 653, 653–82 (1983) (collecting and analyzing more than 43 other studies); Nelson & Rooney, *Fire and Brimstone, Lager and Pot: Religious Involvement and Substance Use,* 43 Sociological Analysis 247, 247–56 (1982).

**37.** *See generally* Christenson, *et al., Value Orientations of Organized Religious Groups,* 68 Society & Sociological Research 194, 194–205 (1983); Mueller, *The Dimensions of Religiosity,* 41 Sociological Analysis 1, 1–24 (1980); *see also* n. 36.

ish religious activities with the father's "sporadic" participation in Catholic religious activities. *Zummo, supra,* 121 Mont.Co.L.Rptr. at 251, 255. It is not entirely clear whether the trial court gave independent significance to this "fact," or whether it was mere surplusage appended to the trial court's other substantive considerations. It is clear, however, that neither determination of, nor consideration of, parents' relative devoutness or activeness in religious activities has any place in custody determinations. The United States Supreme Court has held that, "no person can be punished for entertaining or professing religious beliefs or disbeliefs, or for church attendance or non-attendance," and that, "the Establishment Clause at the very least, prohibits government from ... 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. ACLU, supra,* 492 U.S. at ——, 109 S.Ct. at 3090, 106 L.Ed.2d at 491–92; *cf. JIRB v. Fink, supra,* 532 A.2d at 369. Consideration of the parents' relative devoutness does precisely what is forbidden.

In *Zucco v. Garrett, supra,* an Illinois appeals court found that a preference in custody disputes in favor of an active participant in organized religion would violate the Establishment Clause in the following manner:

The principle or primary effects of giving preference to parents who are active adherents of organized religion will be (1) to punish parents who do not believe in God or going to church by making it less likely that they will gain custody of their children (2) to encourage non-religious, anti-religious or simply disinterested parents to engage in religious practices even if their beliefs are not sincere and (3) to increase the number of children raised in religious households. This goes beyond accommodation and benevolent neutrality towards religion, while not advancing any values protected by the free exercise clause. It places the authority, influence, support and power of the government on the side of organized reli-

gion, a non-secular result that the establishment clause is designed to prevent.

103 Ill.Dec. at 564, 501 N.E.2d at 881; *see also Gould v. Gould,* 116 Wis.2d 493, 342 N.W.2d 426, 432–33 (1984); *Bonjour v. Bonjour,* 592 P.2d 1233, 1243 (Alaska 1979); *Wilson v. Wilson,* 473 P.2d 595, 599 (Wyo.1970); *Welker v. Welker,* 24 Wis.2d 570, 129 N.W.2d 134, 136–38 (1964); *Kendell v. Kendell,* 233 S.W. 296, 298 (Tex.1921); Note, *supra,* 82 Mich.L.Rev. at 1703–27 & nn. 8–84 (detailing various ways in which a preference in favor of a more religious parent would violate the Establishment Clause, collecting cases and authorities).[38]

From the foregoing authorities we conclude that it is constitutionally impermissible to decide a custody or visitation dispute, in whole or in part, on the basis of a determination of or consideration of the parent's relative devoutness. To the extent the trial court's references to the mother's "active" participation and the father's "sporadic" participation in religious activities imply such a determination or consideration, we find such a determination or consideration to have been constitutionally impermissible and an abuse of discretion.[39]

**38.** Women have higher church attendance rates than men generally. *See* de Vaus, *The Impact of Children on Sex Related Differences in Church Attendance,* 43 Sociological Analysis 145, 145–54 (1982). Consequently, consideration of church attendance in custody cases would have a disparate impact in favor of women which might implicate a father's equal protection rights as well as his parental and religious rights.

**39.** We in no way suggest acceptance of the implicit assumption that people whose religion is manifested in active participation in organized religion are therefore more religious, better able to inculcate religious or moral precepts, or more important to the child's spirituality or morality. Such evaluations are also plainly beyond our ken or cognizance. Nor would the relative importance of one parent's influence justify removal of a conflicting influence by the other parent. As Clinical Sociologist Stanley Clawar has cogently observed:

Children absorb beliefs, values, ideas, customs, personality components, a sense of future, and historical linkages (as in ethnic identification) from both parents. Just because one parent attends to certain tasks more so than the other does not mean that the latter is less important in the child's development.

## VIII. Relevance of Perceived Difference In Religions

The trial court took "judicial notice" that "the practice of Judaism and that of Roman Catholicism cannot be squared. To accept and adhere to the teachings of one necessarily requires a rejection of the other." *Zummo, supra,* 121 Mont.Co.L.Rptr. at 255 n. 1. The trial court relied upon this "fact" in concluding that exposure of children being raised as Jews to Catholicism would harm the children. *Id.* This was improper.

Historically, Christians and Jews have often lived in conflict and reciprocal hostility. The historical fact of Christian persecution of Jews is undeniable. *See generally* Petsonk & Remsen, *The Intermarriage Handbook,* Ch. 1 "Jewish–Christian History: A Legacy of Pain," at 17–30 (1988).[40]

Nonetheless, an active dialogue has developed during this generation between Christians and Jews, and particularly Catholics and Jews which has focused attention on the *similarities* between the religions as well as the *differences.*[41] Much of the dialogue emphasizes the unique com-

Clawar, *One House, Two Cars, Three Kids,* 5 Family Advocate 14, 16 (Fall 1982); *see also* nn. 36, 37, 38. Finally, we note that research has indicated that while Catholics married to non-Catholics scored lower in mass attendance and receiving communion than Catholics married to Catholics, they scored comparably on other measures of religious commitment. *See Interfaith Marriage and Religious Commitment Among Catholics,* 48 Journal of Marriage and the Family 725, 725–35 (1986). Church attendance is only one of several factors generally used in gauging "religiosity."

**40.** It should be noted, however, that while Christians persecuted Jews, they also persecuted Christians of other sects and adherents of other religions, as well as agnostics and atheists. English legal historian John Selden observed in his famous *Table Talk,* "for [Jews] being hated, my life for yours, Christians hate one another as much." Selden, *Table Talk,* at 84 (Smith ed. 1689); *see also* Black, *supra,* at 51–67 (to the same effect).

**41.** *See generally Twenty Years of Jewish–Catholic Relations, passim* (Fisher, Rudin & Tanenbaum, eds. 1986); Oesterreicher, *The New Encounter: Between Christians and Jews, passim* (1986); Siegman, *Christian–Jewish Relations: Still A Way to Go,* 35 Judaism 25 (1986); Jacob, *Dialogue and Conflict: Jewish–Christian Relations Today,* 76 Religious Education 587 (1981); Marshall, *Jews and Christians Need Each Other,* 17 Christian Jewish Relations 21 (1984).

monality which Judaism and Christianity share.[42] As a result of the dialogue, much of the formal and informal religious education of Jews about Christianity and of Christians about Judaism has become more respectful and less critical.[43] Thus, while most Christians and Jews might agree that particular tenants of their religion were "irreconcilable" with particular tenants of the other religion, they might note as well significant similarities and commonality. Irreconcilability does not inevitably signify conflict and hostility.

42. *See* Oesterreicher, *supra,* at 8–9, & *passim* (quoting the Nostra Actate of Vatican II on this point); *The Common Bond Christians and Jews: Notes for Religious Relations with the Jews,* 18 Christian Jewish Relations 55 (1985) (document of the Pontifical Commission for Religious Relations with the Jews); Shapiro, *Judaism and Catholicism: Sources of Convergence,* 76 Religious Education 605 (1981). Other commentators have commented on the commonality of *all* religions. *See* Singh, *Religious Pluralism and Co–Existence,* 13 J.Religious Studies 1 (1985). Rabbi Samuel Sandmel observed of both the dialogue and the differences:

> When we use the words Protestantism and Catholicism we unconsciously stress the areas of difference among Christians and glide over the scripture common to them, the common sacred calendar, and common nuances so vital to communal organisms. So also, when we speak of Judaism and Christianity, we seem to stress the abiding differences and to glide over a common belief in God, a common ethic, and a common devotion to education and to charity. The Romans could not discern between Jews and Christians; perhaps a man from Mars would view Judaism and Christianity, even in our day, as more kindred than unrelated.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> For almost eighteen centuries Judaism and Christianity faced each other as enemies. In the past hundred years we have learned much that earlier centuries failed to learn. Perhaps we have now learned that, in a world of many currents and crosscurrents, Judaism and Christianity are not so much on opposite sides of the fence as on the same side. We are not so much opposed as we are different from each other, working in co-operation. The helmsmen of the craft of faith are of different persuasion, but through steering carefully across the currents and crosscurrents of troubled times their direction may well be toward a mainland of understanding, and thereby of blessing to humanity.

Sandmel, *We Jews and Jesus,* at 150–52 (1965).

43. *See generally* Banki, "Religious Education Before and After Vatican II," *in Twenty Years of Jewish–Catholic Relations, supra; see e.g. The Hadassah Magazine Jewish Parenting Book, supra* at 254; Oesteriecher, *The New Encounter, supra* at 299–440; Rosenberg, Meehan & Payne, *Happily Intermarried, supra,* at 12–76.

It is apparent, however, that the extent to which Judaism may be "reconcilable" with Christianity involves theological and philosophical issues far beyond our ken or cognizance. It would be impermissible for us to determine orthodoxy in either religion, let along turn and compare orthodox beliefs in one to those of the other to make a *judicial* determination of the reconcilability of Judaism and Christianity or of any other religions. It is enough here to note again that even irreconcilable doctrinal differences in the religious beliefs held by divorced parents would not provide a basis for imposing restrictions upon a parent's visitation or joint custody rights in absence of a showing of a subtantial threat of harm to the child arising from those differences in absence of the proposed restrictions. Consideration of the presumed irreconcilability of Judaism and Christianity in this case was constitutionally impermissible and an abuse of discretion.

IX. Perceived Probability of Harmful Effects From Exposure To "Inconsistent" Religions

The trial court's principle justification, to which each of the preceding factors were deemed to relate, was the perceived risk of harm to the children arising from their exposure to Catholicism. The trial court concluded that, "to expose the children to a competing religion after so assiduously grounding them in the tenets of Judaism would unfairly confuse and disorient them and quite possibly vitiate the benefits flowing from either religion." 121 Mont.Co.L.Reptr. at 255.[44]

In *Morris*, this Court reviewed decisions of our sister states and concluded that expert testimony that "inconsistent teachings would *probably* result in *some* mental disorientation" was sufficient to impose the restrictions involved

44. We note again that civil courts in this country cannot constitutionally consider *spiritual* harm or the expected benefits of religiosity in general in making custody or visitation decisions. *County of Allegheny v. ACLU, supra; cf. JIRB v. Fink, supra.* The trial court's opinion can reasonably be read to suggest concern regarding *emotional* harm as well. Hence, we review the trial court's justification here as it relates to the constitutionally cognizable question of *emotional* harm.

in *Morris.* 412 A.2d at 147. (Emphasis added). Despite the absence of similar *expert* testimony in this case, the trial court nonetheless found restrictions warranted based upon the mother's similar speculations. *Zummo, supra,* 121 Mont.Co.L.Reptr. at 254–55. This was understandable given the *dictum* in *Morris* that "it is beyond dispute that a young child reared into two inconsistent religious traditions will quite possibly experience some deleterious physical or mental effects." 412 A.2d at 142. The trial court's determination here was nonetheless erroneous.

The vast majority of courts addressing this issue, before and after *Morris,* have concluded that each parent must be free to provide religious exposure and instruction, as that parent sees fit, during any and all period of legal custody or visitation without restriction, unless the challenged beliefs or conduct of the parent are demonstrated to present a substantial threat of present or future, physical or emotional harm to the child in absence of the proposed restriction. *See Ledoux v. Ledoux,* 234 Neb. 479, 452 N.W.2d 1 (1990); *Khalsa v. Khalsa,* 107 N.M. 31, 751 P.2d 715 (App.1988); *Petition of Deierling,* 421 N.W.2d 168 (Iowa App.1988); *Matter of Marriage in Knighton,* 723 S.W.2d 274 (Tex.App. 1987); *Hanson v. Hanson,* 404 N.W.2d 460 (N.D.1987); *Kelly v. Kelly,* 217 N.J.Super. 147, 524 A.2d 1330 (1986); *In re Marriage of Mentry,* 142 Cal.App.3d 260, 190 Cal.Rptr. 843 (1983); *Sanborn v. Sanborn,* 123 N.H. 740, 465 A.2d 888 (1983); *Fisher v. Fisher,* 118 Mich.App. 227, 324 N.W.2d 582 (1982); *In re Marriage of Murga,* 103 Cal. App.3d 498, 163 Cal.Rptr. 79 (1980); *Felton v. Felton,* 383 Mass. 232, 418 N.E.2d 606 (1981); *In re Marriage of Hadeen,* 27 Wash.App. 566, 619 P.2d 374 (1980); *Osier v. Osier,* 410 A.2d 1027 (Me.1980); *Robertson v. Robertson,* 19 Wash.App. 425, 575 P.2d 1092 (1978); *Compton v. Gilmore,* 98 Idaho 190, 560 P.2d 861 (1978); *Harris v. Harris,* 343 So.2d 762 (Miss.1977); *Munoz v. Munoz,* 79 Wash.2d 810, 489 P.2d 1133 (1971). We find the reasoning expressed in these cases to be persuasive, and adopt the standard stated above as applicable in this Commonwealth.

Applying this standard, courts have rejected speculation by parents and by experts as to potential future emotional harm to a *particular* child based upon the assumption that such exposure is *generally* harmful. *See Kelly v. Kelly, supra; Brown v. Szakal, supra; Fisher v. Fisher, supra; Robertson v. Robertson, supra; Munoz v. Munoz, supra.* Likewise, parental attributions of current child disturbances or distress as the result of a religious conflict, rather than the divorce generally or other causes, have similarly been rejected. *See Khalsa v. Khalsa, supra; In re Marriage of Mentry, supra; Compton v. Gilmore, supra; In re Marriage of Murga, supra.*[45]

We emphasize that this standard requires proof of a "substantial threat" rather than "some probability." *Compare Wisconsin v. Yoder, supra,* 406 U.S. at 230, 92 S.Ct. at 1540, 32 L.Ed.2d at 33 *and Morris v. Morris, supra,* 412 A.2d at 147. We also emphasize that while the harm involved may be *present or future* harm, the speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to "contradictory" religions would be a patently insufficient "emotional harm" to justify encroachment by the government upon constitutional parental and religious rights of parents, even in the context of divorce.

For children of divorce in general, and children of intermarriage and divorce especially, exposure to parents' conflicting values, lifestyles, and religious beliefs may indeed cause doubts and stress. However, stress is not always harmful, nor is it always to be avoided and protected against. The key, is not whether the child experiences stress, but whether the stress experienced is unproductively severe. *See In re Constance W., supra; Fatemi v. Fatemi, supra; see generally* Cantor & Parton, *Psychic Con-*

---

**45.** Some courts have explicitly stated that bi-cultural/bi-religious exposure would be beneficial. *See In re Marriage of Gersovitz,* 779 P.2d 883, 884 (Mont.1989); *Petition of Deierling, supra,* 421 N.W.2d at 170; *Tubwon v. Weisberg,* 394 N.W.2d 601, 604 (Minn.App.1986); *Felton v. Felton, supra,* 418 N.E.2d at 607; *cf. Egelkamp v. Egelkamp, supra,* 524 A.2d at 503.

*flict and Moral Development,* 21 Advances in Child Development and Behavior 243, 243–68 (1989) (reviewing authorities); Barnum, *Understanding Controversies in Visitation,* 26 Am.Acad. Child Adol. Psychiat. 788, 788–92 (1987).

In *Fatemi v. Fatemi, supra,* Judge Beck cogently observed:

> It is important for courts to impose restrictions sparingly. Courts ought not impose restrictions which unnecessarily shield children from the true nature of their parents unless it can be shown that some detrimental impact will flow from the specific behavior of the parent. The process of a child's maturation requires that they view and evaluate their parents in the bright light of reality. Children who learn their parents' weaknesses and strengths may be able better to shape life-long relationships with them.

489 A.2d at 801. Assuming that the father's religion is or becomes a source of conflict between him and his children, it is nonetheless important that, absent unproductively severe conflict and distress, the father and the children be permitted to work through the conflict in developing their post-divorce parent-child relationships. Restrictions on this process may themselves generate stress from the artificial or incomplete nature of the parent-child exchange. For this reason too, restrictions must be imposed sparingly.

It is also important to note the problem of causation. In order for the presence of unproductive stress to provide a basis for governmental intervention in a religious upbringing dispute, the unproductively severe stress must result from the religious upbringing dispute. If the child is distressed because the parents have divorced or because of other factors unrelated to the religious upbringing dispute, imposing an orthodoxy in the child's religious training will not remove that distress.

In practice, the occurrence of unproductively severe stress arising from a parental dispute regarding a child's religious upbringing may depend more on the manner in which the dispute is conducted, than the theological aspects

of the dispute itself. It is well established that high levels of parental conflict before or after divorce are a significant factor in the distress experienced by children of divorce, regardless of the source or topic of the conflict. *See* nn. 10 & 16, *supra.* Thus, acrimonious disputes, or situations in which one parent uses religion as a tool to poison his or her children with disrespect for or animosity toward the other parent might present a compelling case for intervention between two Jews or two Christians of similar sects, while a respectful but irreconcilable dispute between a Christian and a Jew would not. *See Ledoux v. Ledoux, supra; Matter of Marriage of Rultand,* 729 S.W.2d 923 (Tex.App. 1987); *Burnham v. Burnham,* 208 Neb. 498, 304 N.W.2d 58, 61–62 (1981); *Lewis v. Lewis,* 260 Ark. 691, 543 S.W.2d 222 (1976) (evidence in support of "poisoning" claim must be fully developed); *cf. Hanson v. Hanson, supra,* 404 N.W.2d at 463–65 (evidence of "poisoning" was insufficient to warrant restrictions); Petsonk & Remsen, *The Intermarriage Handbook, supra,* at 300 (discussing parents' use of religious conflicts as a vehicle to vent unrelated hostility); Gruzen, *Raising Your Jewish/Christian Child, supra,* at 62–63 (same); Yinger, *A Research Note On Interfaith Marriage Statistics,* 7 Journal for the Scientific Study of Religion 97, 98 (1968) (religious differences are often used as a scapegoat for other problems by spouses in conflict).

What little empirical evidence exists regarding the generalized trauma or "marginality" of children of intermarriage presumed to result from their exposure to conflicting religions and/or conflicting value systems suggests an *absence* of generalized trauma and/or "marginality." Professor Egon Mayer has observed that his data:

> add up to an overall impression that the children of intermarriage do not feel any keen pangs of conflict or confusion about themselves, nor do they have fractured relationships with their parents and families. Marginality and all its associated psychological perils undoubtedly plague some, but most are unperturbed by their dual heritage.

Mayer, *Love and Tradition, supra,* at 277; *accord* Valiquette, *Marriage Between Jews and Roman Catholics,* 76 Ecumenicism 42, 42–45 (1984) (finding a general absence of any negative impact on children, or of conflict between parents); Frideres, Goldstein & Gilbert, *The Impact of Jewish–Gentile Intermarriages in Canada,* 2 Journal of Comparative Family Studies 268, 288–75 (Autumn 1971) (same).

In a commentary addressed specifically to the issue of exposure of children to different religions in the context of divorce, Judith Petsonk and Jim Remsen conclude, "exposing a child to more than one religion in the various households to which [the child] is attached does not, by itself, cause [the child] emotional stress or identity confusion." Petsonk & Remsen, *The Intermarriage Handbook, supra,* at 298. Other commentators have recommended exposure to both religions in varying degrees, and have warned that suppression of a significant portion of a child's cultural/religious heritage may itself create a "time bomb" with potential for serious emotional harm in the future. *See generally* Scheidner, *Intermarriage, supra,* at 132–143; Heller, *Talking To Your Children About God, supra,* at 141–56; Rosenberg, Meehan & Payne, *Happily Intermarried, supra,* at 132–143; Cowan & Cowan, *Mixed Blessings,* at 127–65, 255–62 (1988); Gruzen, *Raising Your Jewish Christian Child, supra, passim;* Doyle, *The Roman Catholic Church and Mixed Marriages, supra,* 14 Ecumenical Trends at 83–84; *accord* n. 45, *supra.*

In sum, far from being established "beyond dispute," our research reveals there is no objective basis to support either parental or expert predictions of future harm to a *particular* child based upon an assumption that such exposure is *generally* harmful. The caselaw, commentaries, and empirical studies all suggest, if not compel, an opposite conclusion—that while some may suffer emotional distress from exposure to contradictory religions, most do not. Consequently, the *dictum* in *Morris* suggesting a presumption of

future harm from exposing a child to conflicting religions is expressly disavowed.

We hold that in order to justify restrictions upon parent's rights to inculcate religious beliefs in their children, the party seeking the restriction must demonstrate by competent evidence that the belief or practice of the party to be restricted actually presents a substantial threat of present or future physical or emotional harm to the particular child or children involved in absence of the proposed restriction, and that the restriction is the least instrusive means adequate to prevent the specified harm. Because the evidence presented in this case was wholly insufficient to meet this standard, Clause 6 of the Order of May 6, 1988, forbidding the father to take his children to religious services "contrary to the Jewish faith," must be vacated.

X. Obligations to Take Children to Religious Services

The trial court found "little if any distinction between prohibiting the father's affirmative act of taking his children to Catholic services and its direction that the father present the children at the Synagogue for Sunday School. *Zummo, supra,* 121 Mont.Co.L.Reptr. at 255. We, on the other hand, find a material and controlling distinction; and consequently, affirm that part of the order requiring the father to present his children at the Synagogue for Sunday School.

*Both* parents have rights to inculcate religious beliefs in their children. Accordingly, the trial court may constitutionally accommodate the mother's rights with a directive of the type imposed here, which essentially carves out a time period each Sunday during which the mother has the right to custody and control of the children. *See Rinehimer v. Rinehimer, supra,* 485 A.2d at 1168 (1988) (approving a similar provision); *accord In re Marriage of Tisckos,* 161 Ill.App.3d 302, 112 Ill.Dec. 860, 514 N.E.2d 523 (1987) (characterizing a similar order as an accommodation to the custodial parent, rather than a limitation upon visitation).

In *Rinehimer*, this Court emphasized that "the [trial] court placed no prohibition upon either parent against taking the children to services of his or her faith, discussing religious beliefs, or in any other way exposing the boys to their respective faiths," and that the order was "not designed to frustrate [the father's] religious viewpoint." 485 A.2d at 1168–69. With Clause 6 of the May 6, 1988 order vacated, the same will be true here.

While such provisions generally may be affirmed if they do not otherwise restrict the inculcation of religious beliefs, doubts, or disbeliefs by either parent, we emphasize the constitutional prerequisite of "benign neutrality" towards *both* parent's religious viewpoints. If, for example, the court entered an order which granted a Christian parent custody or visitation on all Christian holy days, but denied similar custody or visitation to the other parent on his or her Jewish holy days. (without an adequate basis to encroach on the parent's right to expose the child to that parent's religious viewpoint as described *supra*), such a provision might constitute an impermissible restriction on religious and parental rights, and a violation of the Establishment Clause, albeit and indirect one. *Cf. Sanborn v. Sanborn*, 123 N.H. 740, 465 A.2d 888, 893–94 (1983).

On the other hand, a parent's right to inculcate religious beliefs in his or her child would not provide a compelling reason to justify the denial of the other parent's right to maintain a meaningful parental relationship with his or her children. If the court must choose between meaningful visitation and the full benefits of a desired program of religious indoctrination, the religious indoctrination must yield to the greater interest in preserving the parent-child relationship. *Cf. Wagner v. Wagner*, 165 N.J.Super. 553, 398 A.2d 918, 920–21 (1979) (involving a virtually identical weekend religious education/visitation scheduling conflict).

Here, despite the father's argument to the contrary, we find that adequate accommodation of the father's visitation right was made. The Saturday religion classes desired by the mother will be made up on weeknights. Moreover, the

mother has indicated willingness to allow the father reasonable weeknight visitation to compensate for the portion of Sunday taken up by the mother's chosen religious indoctrination for her children. The mother's cooperation on this point is noteworthy and commendable.

We find Clause 5 of the order directing the father to present the children at Synagogue for Sunday School to be severable and distinguishable from Clause 6 which forbids the father to take the children to religious services contrary to the Jewish faith. We affirm Clause 5 of the order.

## Conclusion

Based upon the foregoing, we Vacate Clause 6 of the order May 6, 1988. The order is otherwise Affirmed. Jurisdiction is Relinquished.

ROWLEY, J., concurs in the result.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting:

I respectfully dissent from the decision of the majority. The issue here is not a disagreement over the children's religious upbringing, as the majority suggests. Neither are Father's First Amendment rights at issue. Both parents continue to agree after divorce, as they had always agreed before, that the children are to be brought up as Jews. The only issue before the trial court was whether Husband's short weekend periods of physical custody may be impinged upon by requiring him to allow the children to go to Synagogue for Sunday School and whether he should be precluded from taking them to church for Mass. Husband does not dispute the decision that he must take the children to Sunday School. No facts are in dispute. I would conclude that the trial court properly considered the childrens' best interests and exercised sound discretion in ordering that Husband not take the children to church.

Our scope of review of a custody determination has been annunciated in great detail. Appellate review is broad in

the sense that we are not bound by inferences or deductions of the trial court from the facts found, and we need not accept a finding which has no competent evidence to support it. *Commonwealth ex rel. Robinson v. Robinson*, 505 Pa. 226, 478 A.2d 800 (1984), *citing Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977). However:

> "... (T)his broader power of review was never intended to mean that an appellate court is free to nullify the factfinding function of the hearing judge ..."
>
> . . . .
>
> (but, instead, is to remain) within the proper bounds of its review and (base a decision) upon its own independent deductions and inferences *from the facts as found by the hearing judge.*
>
> . . . .
>
> This fundamental limitation of a reviewing court's power has been articulated by the Superior Court as well in defining its own scope of review in custody matters: "... (W)e have recognized that the trial judge is in a position to evaluate the attitude, sincerity, credibility, and demeanor of the witness. Because we are not in such a position, we have recognized that a trial judge's determination of custody should be accorded great weight. *Only where we are constrained to hold that there was a gross abuse of discretion should an appellate court interfere with the decisions of the hearing judge ..."*
>
> . . . .
>
> Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support the trial court's factual conclusions, but may not interfere with those conclusions *unless they are unreasonable in light of the trial court's factual findings.*

*Robinson*, 505 Pa. at 236–237, 478 A.2d at 806 (citations omitted; emphasis by *Robinson* court).

When a trial court makes its determination in a child custody issue, the court's ultimate concern is the child's best interests. *Robinson*, 505 Pa. at 233, 478 A.2d at 804.

This includes a consideration of what will be in the best interests of the child's spiritual development. *Egelkamp v. Egelkamp*, 362 Pa.Super. 269, 524 A.2d 501 (1987). Although of course courts may not render value judgments on the merits of a particular religious belief, they may properly examine the effect of that belief on a child involved in a custody dispute. *Id.* This case no way involves Father's religious freedom. Father's right to go to church is in no way impinged. Father has no unfettered right to expose his children to his religious practices. *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The First Amendment protection does not prohibit a court from considering a parent's religious beliefs in a custody determination and to examine the impact of the parent's beliefs and practices on the child. *Egelkamp, supra.* It was well within the court's discretionary power to agree with Mother that, because the children are being brought up as Jews, attending Mass would unduly confuse them.

In this amicable action, the only subject needing dispute resolution at any point was the scheduling of the shared physical custody. The parents reached an agreement, reduced to writing on April 11, 1988, regarding most scheduling issues. On March 9, 1988 the court held a hearing to determine the only point of contention, which was, as stated by the court, how Father is to "spend [his custody time] as it relates to religion." N.T., 3–9–89 at 4. Father's counsel agreed to this statement of the issue. The court, appropriately sensitive because religious *activities* were being discussed, had Father clarify, throughout the proceeding, the substance of his objection to Wife's demands.

The confusion in analysis of this case arises because going to church is obviously a religious activity. However, we must look to the reason why Father objected to Mother's demand that the children not attend Mass. Father objected because the restriction impinged upon the actual time he spent with the children during the short duration of his physical custody; if the children could not go to Mass with

him, then they would be separated from him during that time. Further, precisely because his periods of physical custody are short, (weekends, holidays, vacations), Father was concerned that he would not have time to fully share his Italian heritage with his children. Attending Mass, he feels, is a good way to expose the children to his Italian heritage.

The trial court credited Mother's testimony that exposure to the contradictory doctrine of Roman Catholicism would confuse and disorient the children. Opinion, July 8, 1988 at 6–7. It is significant that Husband offered no opposing testimony but rather agreed that the children should not have an identity problem with religions. He expressly stated that he did not want to confuse them with regard to religion. N.T., 3–9–88 at 24. When asked whether his children are Jews and whether he wanted them to identify with the Jewish community, Husband answered yes. N.T., 3–9–88 at 26.

> Husband expressed the essence of his concern as follows: I guess I am in agreement with my wife, as far as not creating an identity problem. It's just that—what my contention is that I don't want to be buried as far as my ability to relate to my children and how I relate to my children is really—I mean, what I am is a product of my heritage and my religious training. I don't want to be barred from that.... What's necessary for me is that I can have the freedom to expose them, maybe not on a regular basis, semi-regular basis, I don't know, but at least have that freedom, respecting her wishes as much as possible, and still have the ability to have some way of instilling what's good about my background, ...
>
> ....
>
> I am worried about what kind of input I have with my children, and every aspect, timewise, how they relate to me as a person because of my heritage and my religion, I have a lot at stake here, a lot.
>
> ....

I think I can do them good in their lives, morally, and culturally, and I think that is in their best interests. N.T., 3–9–88 at 50–54, *passim.* The court asked Husband why he used the term "culture" more than the term "religion," and Husband replied that, since he was not religious throughout his life, he finds more value in cultural identity than religious identity. When the court asked him that by cultural did he mean ethnic, Husband replied yes, and that he saw "cultural" as a combination of both ethnic and religious elements. Husband repeatedly emphasized that, because his periods of physical custody were so short, the additional obligation of having to take the children to Sunday School, coupled with not being able to take them to church if he happened to be going, further cut into the quality and duration of the visits.

Husband argues in his brief to this court that although the purpose of the order in question seems secular, it is actually "non-secular and sectarianistic—it is specifically intended to inculcate a particular type of religious belief, i.e., the Jewish Faith." Appellant's brief at 12. My review of the record convinces me that this position bears no relation to the undisputed facts. Both parents agree that the children are Jewish; Husband himself chose to have the children inculcated in the Jewish faith. The agreed-upon scheme of upbringing in this joint custody situation is to raise the children as Jews. Husband does not contest the other portion of the "religious" portion of the order, that he be responsible for taking the children to Jewish Sunday School. I find no support in the record for the majority's implication that, even though the parents may have agreed to bring the children up as Jews during the marriage, the mere fact that there was a divorce throws this agreement into question. To the contrary, the record demonstrates that the parents continue to agree on this point.

The court did not impermissibly evaluate the relative merits of the two religions. Rather, the court weighed Husband's and Wife's concerns about Husband's obligations during his periods of physical custody and designed

a compromise set forth in the order from which Husband now appeals. The court characterized the two restrictions placed upon Husband, that he could not take his children to church and that he must bring his children to their synagogue for Sunday School, as reasonable conditions of physical custody that are motivated by the best interests and welfare of the children and that are no more intrusive than necessary to accomplish a legitimate objective. Opinion, July 8, 1988 at 8. The court allowed that if Husband took the children on trips outside the area, he need not also bring them to Sunday School. This, the court felt, struck an appropriate balance between the "important and appropriate rights of the father to visit and interact with his children, and the children's normal progression within their chosen religion." Opinion, July 8, 1988 at 8–9.

The trial court properly focused on the paramount concern, the best interests of the children. The court took the utmost care to frame the issue precisely as the hearing proceeded and to understand the role of religion in the dispute. The court's inferences and conclusions are based firmly upon the facts of record. Hence, I would hold that the trial court exercised sound discretion, and I would affirm the order of May 6, 1988.