**Meier v. Stegmeier**

*James L. Reich,* for the plaintiff.
*Jennifer L. Grossi,* for the defendant.

Ford, *J.,* March 31, 2010—This is a custody case. The parties are the parents of two young boys. Plaintiff, Bartholomew Meier (Father), was the primary physical custodian of the boys when the custody trial began on March 16, 2010. At the trial, he asked that his petition to relocate to the state of Wisconsin with the boys be granted. Defendant, Susan L. Stegmeier (Mother), was the partial physical custodian of the boys when the trial began. Through her petition, she asked that she be made the primary physical custodian and that the boys be allowed to reside primarily with her in the state of Tennessee. She resides in the state of Tennessee with her hus-

band who is an active-duty member of the United States Army.

Following the March 16 trial, by order dated March 25, I granted Mother's petition for modification. The order provides that the parents continue as the joint legal custodians of the boys. However, Mother was designated as the primary physical custodian. Father's request to relocate to Wisconsin was granted. It is in Wisconsin that he will exercise his partial custody rights under the order. In this opinion, I explain the reasons for the March 25 order.

## PROCEDURAL HISTORY

The parties began their relationship in 2002. They have never been married to each other. The parties have two young sons, Nathan and Addison. The parties separated on a date in 2007.

On February 26, 2008, Father filed the complaint that started this custody action. In the complaint, he sought primary physical custody of the children. The parties lived in Lehigh County at the time.

On August 13, 2008, the court entered an order accepting a written stipulation of the parties whereby they shared both legal and physical custody of the children.

Later in 2008, Mother decided to move to Tennessee. An order was entered on November 18, 2008, accepting another stipulation of the parties whereby they shared legal custody of the children. However, under the stipulation and order, Father became primary physical custodian and Mother became partial physical custodian of

the children. The parties lived under the terms of that order until 2010.

On December 18, 2009, Father filed a notice of intention to relocate to Wisconsin. On the same date, he filed a petition to relocate with the children to Wisconsin.

On January 14, 2010, Mother filed a notice of intention to relocate with the children to the home that she already had in Clarksville, Tennessee. On the same date, she filed a petition for modification of the earlier custody order. In the petition, she asked that she be designated as the primary physical custodian of the children.

On February 4, 2010, Father also filed a petition for special relief repeating the request in his earlier petition to allow him to remove the children from this jurisdiction and to have them reside primarily with him in Wisconsin. In this later petition, he also asked for a hearing under *Plowman v. Plowman,* 409 Pa. Super. 143, 597 A.2d 701 (1991).

I conducted a trial on all of these outstanding petitions on March 16, 2010. I entered an order on March 25, 2010, wherein I granted Mother's request for modification by designating her as the primary physical custodian of the two boys. Father received permission to relocate to the state of Wisconsin with partial physical custody rights rather than the primary custody rights that he sought to maintain. Under the March 25 order, Mother and Father continue to share legal custody rights.

## FINDINGS OF FACT

(1) Mother and Father began their relationship on a date in 2002. Their son, Nathan Meier, was born on

December 16, 2003. He was six years old and in kindergarten at the time of the custody trial on March 16. Their son, Addison Meier, was born on January 24, 2006. He was four years old at the time of the trial. The parties were never married to each other.

(2) At the time the trial began, under the second 2008 agreement and court order, Father was primary physical custodian of the two children. He resides with them at 317 New Street, Walnutport, Northampton County, Pennsylvania. Father is 39 years of age. He has a masters degree. He was trained and has worked as a graphic designer. However, Father is unemployed. He receives unemployment compensation which will expire in May 2010. His last full-time employment was in December of 2008. He then worked part-time until April 2009.

(3) Mother resides at 701 Anita Court, Clarksville, Tennessee. She lives there with her husband, Anthony Stegmeier, who is a specialist (E-4) in the United States Army. Specialist Stegmeier has been deployed to combat zones and is scheduled to deploy to Afghanistan in the late summer of 2010 for a 12- to 15-month tour. Mother has a daughter, Kiera, by Specialist Stegmeier. Kiera was born on September 19, 2009.

(4) Mother works part-time providing emotional and physical support for military families and she works part-time at a YMCA. Her total part-time hours per week are approximately 23.

(5) Mother has a fourth child, Skylar, age 8, who is the oldest of her four children. Skylar resides primarily with his father, Jeffrey Sutton, in Roseto, Northampton County, Pennsylvania. Mother's physical contact with

Skylar is limited. They see each other infrequently each year. They also speak by phone. Mother and Jeffrey Sutton have an excellent relationship. While Mother loves Skylar, almost all significant parenting decisions are made by Mr. Sutton and that is with the consent of Mother. Skylar is engaged in a number of productive activities, excels in the parochial school that he attends and has not had an absence from school in three years. Skylar rarely sees Nathan, Addison and Kiera. On the occasions that the boys have contact with each other, they get along well.

(6) Neither the parties nor the children, Nathan and Addison, who are the subject of this custody proceeding, reside in Lehigh County, Pennsylvania.

(7) Father has investigated job availability for his field in Lehigh County, in Northampton County which adjoins Lehigh County, and in surrounding areas. He has submitted many job applications. These efforts have been unsuccessful.

(8) Father has a job offer, which has been outstanding since late 2009, as a graphic designer for a business known as "Fifty 7" in Eagle River, Wisconsin. Father will earn approximately $24,000 per year in that job which is approximately $16,000 per year less than he earned in his last full-time employment.

(9) Father has a home available to him in Eagle River which he can occupy rent-free with the boys, except for utilities and upkeep. This home is owned by his family. Father grew up in Eagle River. His family still resides there. The home in which he plans to live is located in a

mostly rural section with fields and a few other homes located nearby. Father plans to move immediately to this home. His two motivations for the move are employment and proximity to his family.

(10) Mother, who is 27 years old, became unhappy in her relationship with Father early in 2007. She told Father that she wanted to date other men. She moved out of the bedroom that she shared with Father and moved into another bedroom in the same home. She slept in that bedroom for several months until she moved into the home of her parents in the fall of 2007.

(11) Mother had full-time employment in 2007 and 2008.

(12) After Mother's separation from Father, she briefly dated a man named Chris and then dated a man named Carlos.

(13) As indicated in the procedural history, Mother and Father agreed to shared physical custody of Nathan and Addison after the parties separated. While Father sought primary custody with his complaint filed on February 26, 2008, the parties entered a stipulation which resulted in an order dated August 13, 2008, continuing the shared custody arrangement.

(14) In January of 2008, Mother met her present husband, Anthony Stegmeier. They were married one month later on February 14, 2008. Very shortly after that, Specialist Stegmeier was deployed overseas. Mother has a stable marriage with Specialist Stegmeier.

(15) In August 2008, while her husband was deployed, Mother was living here in the Lehigh Valley. On a day

that month, she returned to her home to find a man lurking inside. He sexually assaulted Mother. While Mother suffered minor physical injuries, she suffered long-term psychological effects. These manifested themselves in nightmares and anxiety. Mother had a particular fear of people approaching her from the rear. Mother also had a fear of being present in the geographic area where the assault occurred. Following the assault, Mother had a tendency to be short-tempered with the children. These effects of the assault were factors that contributed to Mother's decision to leave the Lehigh County area.

(16) Specialist Stegmeier was advised of the assault on his wife. The Army granted him permission to leave his deployment and spend approximately 15 days with Mother in the United States. He was also permitted to remain stateside after that which will be the situation until his deployment in late summer 2010.

(17) Mother received talk therapy in Lehigh County following the assault. She continued with therapy in Tennessee. She is still actively engaged in it. It has helped her adjust to the trauma of the assault.

(18) After Mother and Father's romantic relationship ended, the two of them engaged in regular, heated arguments. Skylar, Nathan and Addison were exposed to these. On some occasions, Skylar would intervene in an attempt to have Mother and Father stop the fighting. As a result of this, Mr. Sutton agreed to take primary custody of Skylar at Mother's request.

(19) Because of the poor relationship which developed between the parties and the various effects that Mother

was still experiencing from the sexual assault upon her, she made the decision to leave this area and to relocate to Tennessee to be near her husband's home base. She felt compelled to make the move to get away from this area, to get healthy and to place herself in a position to ask for primary custody of the boys. Mother made a request to Father that he permit the children to go with her to Tennessee with the arrangement that she be the primary custodian. Father refused. The parties then negotiated an agreement which resulted in the November 1, 2008 stipulation for custody which was accepted by the court and filed on November 18, 2008. Under this stipulation and order, Father became primary physical custodian. Mother's partial custody rights included time with the children for eight weeks in the summer and four major holidays. Mother was also granted the opportunity for other contacts with the children when she could return to Pennsylvania.

(20) While Mother was granted eight weeks of partial custody with the boys for the summer of 2009, she only exercised six weeks of that custody time. During the summer, she was in the final months of her pregnancy with Kiera and she had high blood pressure. She was compelled to reduce the eight weeks of custody to six weeks of custody for these reasons. Mother has exercised the other specific custody periods given to her under the order of November 18, 2008.

(21) Mother and Father communicate with each other as little as possible. The children are suffering from this lack of communication. Both parties are at fault in this failure of the parents to effectively co-parent.

(22) Mother has taken a number of significant steps to stay involved in Nathan and Addison's lives even though the time granted her under the stipulated order is limited. She has made sure that medical and dental insurance exist for Nathan and Addison through the military. She has paid all co-pays. She has been in contact with Nathan's school to monitor his progress including the arranging for and actually attending a parent-teacher conference. She has maintained regular contact with the boys by phone. Because of Father's conduct when she places calls to his home, the phone calls have been less frequent than they could be and less than she desires.

(23) When Mother telephones Father's home, Father does not put each child on the phone to have a discussion with Mother. He does not insist that they direct their attention to Mother who is on the phone. Rather, he puts the phone down (or perhaps uses a speakerphone) and allows the children to continue in whatever activities they do when Mother calls. Mother just listens to them and catches conversations when she can. Father sets no rules for the boys when Mother calls. He believes they should be allowed to conduct themselves the way they want when she calls. Because of this approach by Father, these calls are largely a waste of time. They have done very little to nothing to foster Mother's relationship with the boys.

(24) Father faults Mother for not exercising custody more than she did since she moved to Tennessee. He has not facilitated additional contact for her. When Mother came to Lehigh County for the last custody conference earlier this year, she asked Father if she could spend some time with the boys. He initially refused and said that the

boys had to go to a birthday party in Maryland. At the custody conference itself, an agreement was then reached and Mother was allowed to see the boys. Mother arrived in Pennsylvania a few days before the start of the March 16 custody trial. She and Father arranged for her to spend time with the boys starting March 15. For reasons that are unclear to Mother, Father cancelled Mother's meeting with the boys on March 15 and moved it to the end of court on March 16.

(25) Father does not promote Mother's relationship with the boys. He has squandered opportunities to enhance that relationship even though Mother has infrequent contact with the boys since she moved to Tennessee. The missed opportunities have occurred when Mother attempts to speak with the boys by phone, as described above, and when Father rendered face-to-face contact for her with the boys difficult on the two occasions noted. Mother does not promote Father's relationship with the boys. (There is no evidence though that she undermines that relationship or misses specific chances to enhance it.)

(26) When the parents resided together, they shared co-parenting duties and they performed those duties well from the births of the boys until the parties' separation.

(27) After the parties separated, during their respective periods of custody, they performed their parenting functions well with the exceptions noted in these findings of fact.

(28) Specialist Stegmeier is an appropriate stepparent in that he assists in caring for the boys when they are in Mother's custody, supports her in her plan to become

primary custodian and, in his actions, respects the roles of the biological parents.

(29) Mother has a network of friends and support through the military families near her home in Clarksville, Tennessee.

(30) Nathan has a problem with bowel movements that should cause concern to both parents. An inordinate number of days pass between many of his bowel movements. Nathan has difficulty with having bowel movements on a regular basis. He then has unexpected accidents.

(31) In 2006, Mother and maternal grandmother, Nedra Michael, took Nathan to a specialist for assistance with the bowel movement problem. The specialist created diet suggestions for Mother and Ms. Michael with which they have attempted to comply. In the summer of 2009, during Mother's custody period, she was partially successful with Nathan in addressing the bowel movement problem by following the dietary suggestions and creating a bathroom schedule for Nathan. Mother's plan, if she were granted primary custody, would be to fully. address the issue that Nathan has, continue with the dietary and schedule approaches, and make use of the nutritionist who is available to her at the base through the United States Army. She would like to try to resolve the issue without medication. Mother is appropriately concerned about the issue.

(32) Father addressed Nathan's bowel problem by a regular schedule of administering Miralax. He now regularly gives Benefiber to Nathan. (It is unclear from both Mother's and Father's testimony whether these are

prescription items and, if they are, who prescribed them.)

(33) Despite Father's testimony that Nathan no longer has problems going to the bathroom or with bowel movements, these problems continue for Nathan. Father was not forthcoming in his testimony as to whether Nathan continues to have bowel movement accidents and he was not forthcoming in his testimony about the diet that he provides for Nathan. Father provided no plan for addressing Nathan's ongoing bowel movement problem other than continuing to provide food for him and administration of the Benefiber. Nathan needs more sustained attention than Father is presently providing him.

(34) Addison has significant emotional issues that manifest themselves in disturbing ways. He "spins," to use the word of the parties, when he gets excited. This involves his going to the ground or floor and moving his body in circles. Addison has speech issues which include stuttering. These physical manifestations have not been properly investigated and addressed.

(35) Mother recognizes there is an emotional problem with Addison. Father does not. Mother's plan for addressing the problem is commendatory, as far as it goes, namely, spending more time with Addison, giving attention to him and listening to the concerns that he expresses. However, an evaluation by the appropriate expert with the necessary follow-up is needed.

(36) Mother has family members, particularly the maternal grandmother and Skylar, who reside in the Lehigh Valley area. She does not have extended family in Tennessee. However, she has her immediate family of

Specialist Stegmeier and her infant daughter, Kiera. She also has the support of friends and the military families in Tennessee.

(37) Father does not have family members living in the Lehigh Valley or in Tennessee. However, his mother, siblings and other relatives reside in the Eagle River, Wisconsin area. He is particularly close with his mother and an uncle.

(38) In terms of physical environment and the support of family and friends, both Mother and Father have much to offer the boys with their respective homes in Tennessee and Wisconsin. Both provide fine environments for the upbringing of the boys.

(39) Through therapy in the Lehigh Valley and Tennessee, removing herself from the area where the sexual assault occurred, providing herself with time to stabilize her living situation, and by now being part of an intact marriage, Mother is in a position to provide an environment for a stable upbringing of Nathan and Addison. She has in place appropriate plans, with the addition of some court-ordered requirements, to address the significant issues that Nathan and Addison have had for an extended period of time.

(40) During Mother's period of being a partial physical custodian of the boys over the past (approximately) one year and five months, her love and concern for them and her desire to be their primary custodian have continued unabated. She has done all that is reasonable under the circumstances to remain actively involved in their lives.

(41) While Father has not yet moved to his new home in Eagle River, Wisconsin or begun his new job there, he plans to relocate immediately. He has demonstrated by his performance since his separation from Mother that he provides a proper home for the boys and he loves them. Father does not have in place an adequate plan to address Nathan's bowel movement issue. He has no plan in place to address Addison's emotional issues. He does not recognize the boys' problems, minimizes them or ignores them.

(42) Father has improperly discussed custody issues with Nathan. He told Nathan that "Daddy needs to move." He made this statement even though he was seeking court permission for relocation. Nathan asked him if they (Nathan and Addison) "have to go to Mommy's." Father responded, "No."

## DISCUSSION AND CONCLUSIONS OF LAW

As the court and counsel recognize, the paramount consideration in a custody case is the best interests of the children. *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845 (1992). In my attempts to determine the best interests of Nathan and Addison, I considered "all factors which legitimately impact upon the [children's] physical, intellectual, moral and spiritual well-being. . . ." *Zummo v. Zummo*, 394 Pa. Super. 30, 45, 574 A.2d 1130, 1137 (1990).

The best interests of the children, Nathan and Addison, require that Mother be their primary physical custodian. Her marriage with Specialist Stegmeier is stable. Her love and concern for Nathan and Addison are evident

and they have gone undiminished even during the period of her partial physical custody. She left this geographical area to compose herself in light of the bad relationship with Father (as to which both parents share the blame) and after the trauma of the sexual assault. She has done a good job in getting her life together, in taking care of the children when she had them and in constructing a plan to address all of the boys' needs. She does not have immediate family in the Tennessee area but she has the support of her husband and the friendship and support of military families.

By having the boys live with Mother as their primary custodian, they will be raised with their younger half-sister, Kiera. Absent compelling reasons to the contrary, siblings should be raised together in one household whenever possible. *Albright v. Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 (1980); and *Ferdinand v. Ferdinand,* 763 A.2d 820 (Pa. Super. 2000). There are no compelling reasons to the contrary in this case. Mother will also have the boys be in contact with Skylar although it is recognized that such contact will rarely occur. Mother should attempt more contact with Skylar than has occurred in the past.

Mother acknowledges the bowel problem that Nathan has and the emotional problems that Addison has. She has definitive and acceptable plans to address Nathan's problem. She has a plan for Addison. What she plans for Addison is appropriate but more is required. The additional requirement was made part of the court order of March 25. The important point here is the recognition by Mother of these issues with both children and her

eagerness to properly address them. Mother included these topics in her answer when she was asked why she felt it would be best for the boys to live with her as primary custodian. Her answer was:

"Because I love them and miss them and they have a baby sister named Kiera, and they love and adore her and I think I can get them on a schedule. When I have them in the summer, we're on a schedule. I'd like to keep that. I'd like to take Nathan to the nutritionist without medication and Addison, I think Addison needs some more time where people listen to him."

Mother's primary shortcoming is her failure to effectively communicate with Father. In fact, she avoids communication with him as often as possible. This is unfortunate. Under the terms of the March 25 order, Mother must do better. On the other hand, while Mother's communication with Father has been poor, she has done nothing, under the evidence in this case, to denigrate Father in the eyes of the children or to hinder his relationship with them.

Maternal grandmother, Nedra Michael, has been a positive influence in the lives of Nathan and Addison. Because Mother maintains regular contact with her mother who lives in this area, it is anticipated that the maternal grandmother will remain involved in the children's lives and that is a good thing. Father has a good relationship with Ms. Michael. To his credit, he has promoted her relationship with the boys.

From the little evidence that was presented about the paternal grandmother, it appears that she has a loving

relationship with the boys and she will build on that once Father relocates to Wisconsin.

Father's love and concern for his two boys are unquestioned. He has done a good job in providing care for his children and in performing all of the duties that responsible parents perform. This includes the duties in the children's very young years which Mother also performed. He has taken good care of them over the past year and five months while he was the primary custodian.

Father has his shortcomings too.

Since Father became primary custodian, he has not facilitated Mother's contact and relationship with Nathan and Addison. The way that he handles his end of phone conversations when Mother calls his home to talk to the boys is ridiculous. He lets the boys dictate the rules when Mother calls and refuses to put into place what is necessary so that these calls can be worthwhile. This certainly does not convey the message to the children that their Mother plays an important role in their lives and that they need to remain in contact with her during the periods when she had limited contact. It also shows deficiencies in Father's setting rules for his young children. The way that Father handled these calls over his time as primary custodian was unfair to Mother.

Father, like Mother, communicates as little as possible. The court is expecting a change in him on this topic, too. Father criticized Mother at trial for not attempting to spend more time with the boys than the specific, established custody times in the last order. That position of Father is disingenuous because Father has impeded or

made it difficult for Mother to spend extra time with the children. While Mother got to see the boys at the time of the custody conference in January 2010, after an agreement was reached at that conference, that followed Father's refusal to let her see the boys so that they could go to a birthday party in Maryland.

There was brief testimony at the trial about Mother's arrival in Pennsylvania for the trial. I only mention this because of the stand that Father takes that Mother has not sought additional time with the children. Mother was supposed to see the children on March 15, the day before the trial began. Father changed that to March 16 for reasons that he did not adequately explain to Mother

Father discussed custody issues with Nathan and promised him something that he had no business promising. He told Nathan that "Daddy needs to move." He made this statement knowing that the court was going to decide his petition for relocation. When Nathan asked if he and Addison had to go to Mother's, Father responded "No." Father did not act in Nathan's best interest in having this discussion, a discussion begun by Father.

It was difficult to get information from Father about his views and how he responds to Nathan's bowel movement problem and Addison's emotional displays. For some reason, Father was not straightforward in his responses to various questions regarding both children. As to Addison, he either was not forthcoming with what he sees in Addison's emotional displays or minimizes the issue or fails to see that there is a problem at all. If the children remain in the primary care of Father, the court's concern is that Nathan's bowel movement problem will

not be properly addressed by Father and Addison's emotional issues will be ignored.

As I indicated earlier, one of the petitions at the trial was Father's petition to relocate to Wisconsin where he wanted to remain primary physical custodian. Mother objected to the relocation under those circumstances. She had no objection to his relocation if she became the primary physical custodian.

As can be seen, this is not a typical relocation case. Mother has been residing out of state for one year and five months. Her moving to Tennessee was not opposed at that point by Father. Father does not reside in Lehigh County, Pennsylvania. He resides in an adjoining county and wishes to relocate from it. Whether Father remained in the adjoining county or moved to Wisconsin, Mother contested his remaining primary physical custodian.

As an aid in focusing on what is in the best interests of children in a relocation situation, the Pennsylvania Superior Court has set forth factors for the trial court to consider. The factors stated by the Superior Court are:

"First, the court must assess the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent. . . .

"Next, the court must establish the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it. . . .

"Finally, the court must consider the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent." *Gruber v. Gruber,* 400 Pa. Super. 174, 184-85, 583 A.2d 434, 439 (1990).

There is a potential advantage in Father's move to Wisconsin, namely, he would become employed after a significant period of unemployment and he would be living near his family. He is close with his family and they, particularly his mother and uncle, probably will be a positive factor in the lives of the children. (I say "probably" because these people did not testify and there was little information about them.) The Father's decision to move to Wisconsin is not the result of a momentary whim.

Mother questioned the desirability of having the boys live in Eagle River, Wisconsin. She had several contentions in this regard. While she did not doubt that Father will be able to move into his family's home and that the home is adequately sized, she believes that it is dreary and contains dated fixtures and appliances. She believed that the boys will be bored while they live in Eagle River because the area is rural with few young people or attractions in the vicinity. The court rejects these contentions. Father has demonstrated that he can provide a good environment and wonderful opportunities for the children in Eagle River, Wisconsin. Nevertheless, there are other factors too, which I have already discussed, which weigh in the determination of primary custody.

Father's motives for his move to Wisconsin are understandable and acceptable. He has a chance for employ-

ment and for a home near his family. While Mother did not present convincing reasons to oppose the move to Wisconsin, her efforts at trial were focused on convincing the court that it is preferable that she be the primary physical custodian. She has succeeded in doing that.

The parents have already lived under circumstances where Mother had to travel quite a distance to the home of Father in order to spend time with the children. Father's home near Lehigh County is approximately equidistant with his planned home in Wisconsin, to Mother's home in Tennessee. Mother has paid all of her transportation expenses to this point. Mother has agreed that, if she were granted primary custody of the children, she would be willing to share the transportation expenses for Father's trips to Tennessee. Thus, there are available, realistic custody arrangements possible for Father to remain meaningfully involved in the children's lives whether Father resides in Pennsylvania or Wisconsin.

After my assessment of the parties, which is crucial in this case, and consideration of all of the factors that I have discussed in this opinion, it is clear that the best interests of the children require that Mother be made the primary physical custodian of the children with meaningful partial custody rights granted to Father. Both parents have the opportunity to remain involved in their children's lives and to be influential caregivers as the boys grow to adulthood. The parents' lives can be made easier and their children benefit if both parents now make the effort to communicate with each other as often as possible about the children and to actually be kind to each other for the sake of their sons.